■ Mr Chief Justice Maiishali.
 

 delivered the opinion of the Court.
 

 This is a. writ of error to a judgment rendered in the court of the United States for the sixth circuit and district of Georgia, in a case in which the plaintiff in error was plain
 
 *226
 
 tiff in ejectment. The plaintiff derived title from d .grant dated in.May 1787; which was issued by the governor of Georgia tó Bazil Jones. . At the trial, the. counsel for the plaintiff moved the court tó instruct the jury on several points,'on all which the judges were divided; and therefore the instructions were refuséd, to which refusal, exceptions were taken. The verdict and judgment were rendered in favour of the defendants ; and the plaintiff has sued oüt this writ of error, by winch the record is removed into this Court. >T{ie opinions refused by the court, and the exceptions taken by counsel, will be severally considered,
 

 The first is in these words.
 

 The plaintiff moreover gave evidence conducing to prove, that' the soiith fork of the Oconee river, known as the Ap-palachie, runs through the land described by the grant and plat aforesaid, under which the plaintiff derives title; and that all the lands within the said grant, which are in possession of the defendants in this action, are on the north and east side of the said south fork of the Oconee river, and within the territorial limits of the state of Georgia, as defined by Hawkins’s line, which said line was run by Benjamin Hawkins, under the authority of the United States, to define the temporary boundary line between the state of Georgia and the Creek Indians; and that all the lands included within the aforesaid grant are 'situated on the waters of the said south fork of the Oconee river. And thereupon, the counsel for. the said plaintiff moved the court to instruct the jury, that the grant from the state of Georgia to Bazil Jones, under which , the plaintiff derives title to 7160 acres of land in ■Franklin county, in said state, was a legal and valid grant; which instruction the court, being divided in opinion; refused to give.
 

 This prayer is expressed in such terms that the court could not with propriety have granted it without explanation; whatever opinion on the . law of the case might have been entertained. Without stating a single fact, or placing the prayer on the belief of the jury that, the evidence proved any fact,1 the court is asked to say positively, that the grant to Bazil Jones is legal and valid. Undoubtedly the presump
 
 *227
 
 tion is in favour of the validity of every grant issued in the forms prescribed by láwj, and it is incumbent on him who controverts it, to support .his objections. The whole bur-then of proof lies on. him; but if his objections dépend on facts, those facts must be*submitted to a jury. If opposing testimony be produced, that testimony also must be lard before the jury; and the court may declare the law on the fact, but cannot, declare it on the testimony.. In this case, the prayer states that the plaintiff offered testimony conducing to prove certain facts which were deemed essential to the validity of the grant, and asked sthe court to say, not that if the testimony was believed, or. if 'those facts wete proved, the grant was valid, but positively that the grant was valid; The court did not err in refusing to give this instruction.
 

 The second exception states that the counsel, for. the plaintiff also moved the court to instruct the jury, that, upon the aforesaid evidence, taking the same as true, the said tract of land, so granted to Bazil Jones., .was, at the time of the survey and grant thereof, within the territorial limits of the state of Georgia as ascertained by laws and treaties, within the .limits of Franklin county as by law defined, and not within the Indian boundary line; which instruction; the court, being divided in opinion, refused to give.
 

 This prayer, is made 'on the admission of the testimony stated in the first, and on its sufficiency to prove that the tract of land granted to Bazil’ Jones wás situated on the waters of the south fork of the Oconee river; and that the' .land in controversy lay on the north and. east side of that fork, and within the territorial limits of the state of Georgia, as defined by the- line run by Bénjamin Hawkins, under the. authority of the United. States, to define the temporary boundary fine between the state of Georgia and the Creek Indians.
 

 From these facts the court is asked to draw the conclusion that the tract of land ivas, át the time of the survey andi grant thereof, within the territorial limits of the state of Georgia, and within the fimits of Franklin county, as by law defined; and not within the Indian boundary line.
 

 This prayer requires the court to say what was.the boun
 
 *228
 
 dary between that part of the state of Georgia, to which its jurisdiction was extended, and the-Indians; and also what were the limits of Franklin county. As it requires an in-strúction respecting the whole tract, the court was bound to inquire whether the whole tract .was within those limits. To ascertain these boundaries, the laws of Georgia, and the treaties of that state with the Creek and Cherokee Indians, must be examined.
 

 On the 31st day of May, in the year 1783, a treaty was made at Augusta, between the state of Georgia and the Cherokee Indians, describing the line which should thereafter separate the settlements of the whites from the hunting grounds of the Indians. This line commences on the Savannah river, and is of no importance in this case until it reaches the top of the Currohee mountain. It is-to proceed “ thence to the head or source of the most southern branch of the Oconete river including; all the waters of the same,' and thence down the middle of the said branch1 to the Creek line.”
 

 On .the firsj day of November in the same year, the state of Georgia formed a treaty with the Creek Indians, for the purpose of dtawing.the. line between the settlements of the whites and the hunting grounds of the Indians. This line also commences on the Savannah river, and runs as described in the treaty to the top of the Currohee mountain. It proceeds “ thence to the head or source of the most souther!} branch of. the Oconee, river, including all the waters of the same, thence down the said river to the old line.”
 

 A subsequent treaty was held with the Creeks on the 12th of November 1785, at Galphinton. The 4th article of this treaty declares, that “ the present temporary line reserved tó the Indians for their hunting ground, shall be agreeable to the treaty held at Augusta in the year 1783.
 

 On the 28th of November 1785, the commissioners of the United States, held a treaty with the Cherokees at Hopewell; in which it was agreed that the boundary line should run from the top of the Currohee mountain “ to .the head of the south fork of Oconee fiver.”
 

 The tféaty at Shoulder-bone, cóncluded in the year 1786,
 
 *229
 
 confirmed the line as established in the treaties of Augusta and of Galphinton. All the treaties, between Georgia and the Indians, stipulate that the lines shall be marked as soon as possible; but it does not appear that they were ever marked. A.treaty was afterwards entered into _a!t IN ew York, between the United States and Creek Indians, on the 7th day of.August in the year 1790, which fixes the boundary line from'the top of the Currohee .mountain, “to the .head or source of the main south branch of the Oconee river, called the Appalachie,-thence down the middle of the. said south branch to its confluence with the Oakmulgee.”
 

 In pursuance of this treaty, the line from the Currohee mountain to the head or source of the main south branch of the river Oconee; was run by Benjamin Hawkins.
 

 Some ambiguity undoubtedly exists in the treaty made with the Creeks at Augusta, which, in a contest between Georgia and the Creeks, might claim a construction favourable to the pretension of the less powerful and less intelligent or skilful party to the compact. But in a controversy in which both parties claim title under the state of Georgia, it would seem reasonable to give the article that construction which Georgia.herself has put upon it, provided it.be reconcileable to the words. The line is to. run “to the source of the most southern branch of the Oconee river, including all the waters of the same.” The source of the most southern branch is the source of the main stream of that branch. It is a point to which the line is to be run from the top of the Currohee mountain. This line, if the treaty gave no directions. respecting its course; would be a straight line. But the treaty directs it to be so. run as “ to include all the waters ot the same;” that is, “all the waters”- of the most southern branch. The line must therefore be. drawn from the one given point to the other; in such direction as to include all the wafers of. the ihost southern branch of the Oconee.. It must therefore, instead of being straight, pass round the sources of all those streams which empty into the. south fork on its northern side, and aré between the points of commencement and of termination. But it is obvious that no. line fróm the top of the Currohee mountain to the
 
 *230
 
 source of the most southern brunch of the Oconee river, can include the waters Which empty into it on the southern side.
 

 To bhviáté this difficulty, the defendants insist that the .line shall pass round the ftiaimbranoh bf the south fork of the Ocohee to the source of the lowest stream,which empties into it on the south side, and proceed down that stream.
 

 This line Would include all the waters of the south fork, but is attended with, other difficulties of no inconsiderable magnitude. The words of the treaty seem to require that the line should stop at the Source bf the main stream, not at the source of an inconsiderable rivulet. From this source the line is to proceed doWh the river.. It is reasonable to suppose that it proceeds down the river from the soUrGe of the ri ver, not from the source of a small branch. It is to include all, the waters¿ that , is all the tributary streams of that at whose source it stops. But this construction requires it to stop at the source of a stream, which is itself tributary to the Very river; which is spoken of as one of its waters.
 

 If this construction be admitted,. add the. source of the lowest stream oñ the. south side be substituted for the source of the main stream, still the libe must run down that lowest water course to the south fork; and down the south, fork to. the old line. The casé does not inform US, that oven this line would include the whole tract granted to Basil Jones. That tract is stated to lié "on thé waters of the south Fork, but not on the Georgia side Of the. most e&tremeofthdse waters. Go much of it as tóay be. situated on the Judian side of that water course, would be within the Indian hunt-? ing grounds.
 

 The treaty made .with the. Cherokeés at Augusta on the' 1st day;pf June; 1^03, is apparently intended to establish the, same line'which Was afterwards adopted in the treaty With the Greeks.. The only variance in the language: is that in the treaty with, the CherOkees, the line from the Source Of the southern, branch of the Oconee river, is to run ■“ down the middle of the Said branchIn the treaty with the Creeks, it is to run “ dow.n the rivér.”' It is not probable that different hubs Could have been intended.
 

 If the state of Georgia has construed this treaty by any
 
 *231
 
 subsequent acts, manifesting her understanding of it, we should not hesitate to adopt that construction in this case. But the bill of exceptions contains no fact, showing that Georgia has adopted a construction of her treaties with the Indians, which would establish the boundary claimed by the plaintiff. On the contrary, in February 1787, an act was passed “ for the appointment of commissioners to run the line designating the Indian hunting grounds.” This act directs the commissioners to proceed in conjunction with those to be appointed by the Creek nation, to trace and mark “the temporary boundary line, as heretofore established'; that is to say,, from the Currohee mountain, in the direction of the present temporary line from- Zu-galo river, till the same shall strike the head or source of the main direct stream .of the south branch of Oconee river, called also Appalachie, by which is to be understood the main fork of Oconee river, next above Little river.”
 

 , This act seems to reject all claim, on the part of Georgia, to lands lying south of the main stream of the south branch of Oconee, and to adopt the construction of the treaties at Augusta, which appears to have be'en adopted by the commissioners of the United States, at the treaty, at Hopewell, in 1785.
 

 ■ The prayer we are considering, also requested the court to instruct the jury that the tract of land granted to Bazil Jones was within the limits of Franklin county as by law defined.
 

 .'In February 1,784, the legislature passed an act for laying off twb more counties to the westvvard. One of these was the county of Franklin.
 

 The first section declares, “that.the present temporary fine, circumscribing the Indian, hunting ground, shall be marked by a line drawn from that part of the north branch of Savannah river, known by the pame of the Ovvee, which shall be intersected by a line north east from the Oconee mountains; thence in the same direction to Zugalo river; from thence-in a direct line to the top of Currohee mountain ; thence to the head or source of the most southern stream of the Oconee river, including all the waters of the
 
 *232
 
 saíne; thence down the said rivqr to the old line, thence along the old line.”
 

 , The only difference between this legislative description of the line, circumscribing the Indian hunting ground, and that in the treaty, is in the substitution of the word “.stream,” for the word “ branch.” In the treaty, “ the branch,” and in the law,'“the.stream,” appear to. be considered as “ the river.” ’ The line is to run from its source “down the'said river.”. This language would seem .to indicate, that' a considerable, or main branch,- or stream; one which had acquired the name of-river; not a small rivulet, was in tihe mind of the legislature. The line which runs to it from the top qf the Currohee mountain is subject to all the uncertainty which, attends the same line, as described in the treaty of Augusta.
 

 The 2d section of the act proceeds to define the exterior lines of the eoúnty of Franklin.. They rún from the Savan-. nah river to the south branch of the Ocon.ee’ river ; thence, up' the said river, to the head, or source of the most southern stream thereof; thence along the temporary line, separating the, Indian hunting ground, to the northern branch of the Savannah,. &p.
 

 . The. southern boundary of Franklin county, from the place where the line from the Savannah strikes the most southern branch of the Oconee river, is up that river to the head or source of the most, southern stream thereof. You find the head or source of this most southern, stream,' by proceeding up the river.
 

 It may well be doubted whether. this description will admit of. leaving the river for any of its small rivulets. The words, the-most southern stream of the south branch of the Oconee, whose source is tp be found by proceeding up the river, may be satisfied, either by pursuing the most southern stream which has .acquired the name of river, or the most southern stream which empties into the river. It can scarcely be imagined that Georgia has not settled practically the limits of Franklin county; and any such settlement ought to have been conclusive with the circuit court. But no such' settlement is stated in the record, and the court’ is required
 
 *233
 
 to say, in what manner its boundary lines are to be draw n, in pursuance of the act of assembly by which it was constituted. The court is relieved from the difficulty by the same circumstance which made it unnecessary to determine the line which circumscribéd the Indian hunting grounds. The statement of fact ,on which the opinion of the court is asked, does not affirm that the land lies on the northern, or Georgia side of the most southern stream, but that it lies on the waters of the south branch of the Oconee river. For this reason this instruction ought not to have been given as asked.
 

 The third exception states, that the said counsel for the plaintiff also moved the court to instruct the jury, that the said grant to Bazil Jones, under which plaintiff derived title, was a lggal and valid grantj for all the lands exhibited on the plat as lying north and east of the south fork of the Oconee river, now called Appalachie,
 
 including all the waters of the same;
 
 which instruction, the court, being divided in opinion, refused to give.
 

 The court understands the. words, “ including all the waters of the same,” to mean waters north and east of the south fork of the Oconee river. This application, like the second, is supposed to be made on the assumption that the facts stated in the first are trué. If they are, „ then all the land contained in the. patent, lying north and east of the south branch of Oconee, is on the Georgia side of the line circumscribing the Indian hunting ground, and within the county of Franklin, as described by law. The application supposed to be made to the court,. is to instruct the jury that the grant is good for so much land as lies within the county of Franklin, although part of the tract may be without that county' and within the Indian boundary. • The counsel for the defendants insist that, under the laws of Georgia, the whole patent is void, if any part of the land it purports to. grant be within the Indian boundary. The counsel for the plaintiff contend that the laws, so far as they have declared patents to' be void, are entirely retrospective; and that'prospectively, they only inflict penalties on persons who shall make surveys in contravention' of the statute.
 

 
 *234
 
 In January 1780, an act was passed “ for the more speedy and effectual, settling of this staté.” The, 19th section enacts,.
 
 *
 
 that no Warrant,' survey or plat, made or laid' out in the lands yet within the lines of the Indians, shall .be held valid, and the same is hereby declared null and void to all intents and purposes whatever; nor shall any grant which may hereafter be surreptitiously obtained, be deemed .legal or of any effect.” .
 

 We do. nd[t think the language of this section entirely retrospective. The words “ made or laid out,” may apply to the future as well as the past, and comprehend Warrants and surveys ,whi,ch. shall be, as well as those which have been, made1 or laid out: in the lands yet within the lines of the Indians.
 

 ' In February 1783,' Georgia passed an act for opening her land office. The 11th section of this as is retrospective so fat as it annuls surveys and grants, . Its prospective provisions only inflict, penalties on the persons who shall make surveys or. attempt to obtain a grant. . But the 13th sections, after describing the limits of the state, provides, “ that nothing hérein before contained shall extend, or be construed to extend, to authorize or empower any surveyor, or, other person or persons whatsoever, to survey, run, or make lines upion the lands,, before described as being allowed to the Indians for Hunting ground, or any part or parcel thereof, before or until permission for that purpose shall be granted by the, legislature and made known by proclamation.”
 

 In consequence of this proviso, the. land office could not be considered as opened for lands within the Indian boundary;,
 

 The 5th section of the act of 1785, which has been relied on, is retrospective.
 

 The act of February 1787, for the appointment of. commissioners to run the line designating the- Indian hunting ground, inflicts'additional penalties"'on those who shall thereafter survey or cause tó be surveyed, or obtain grants for any lands beyond the temporary line designating the Indian hunting ground. The. 3d section is in these Words, “ whereas, notwithstanding the most positive laws to the
 
 *235
 
 contrary, many persons, from design or accident, hare ¿run large quantities of land and obtained grants for the same, southward of the present temporary, line .between'the good citizens of this state and the Indians, and expect: to hold the same when a cession of said land can be obtained.,.. Be it therefore enacted, that the surveys or grants for such land be considered,, and they are hereby'declared to be null and void, and of no effect whatever.”
 

 "This enactment is undoubtedly retrospective. * It" manifests, however, unequivocally the opinion of the legislature, that .all the surveys and grants which are declared Void, had been made and issued contrary to the most positive laws* Howbver thgse laws may be construed, it is, we think, obvious, that the office was not opened for lands situated within the Indian hunting grounds, and that grants for them. were not authorized.
 

 But is the whole, grant a nullity because it contains some land not grantable
 

 . In the-nature of the thing, we perceive no reason why the grant should not be good -for' land which it. might lawfully pass, and void as to that part of the tract for the granting of which the office-had not been opened. It is every day’s practice to make grants for lands, which have in fact been granted to others. It has never been suggested that thq whole grant is void because a part-of the land was not grantable.
 

 -The act of February 1807, after stating “ that many persons had run large quantities of land,' and obtained grants for the same southward of the present temporary line be-tweeen the good citizens of this state and the Indians,” enacts “ that the surveys or grants for such lands shall be considered null and void;” and the survey in this.case was made in September 1786.
 

 This enactment might with as much propriety be construed'to apply to those surveys only, which were made entirely within the Indian boundary, as to that part of a survey which lies on the Georgia side of that boundary. Neither construction would probably pursue the real intent of the legislature. Georgia was willing to grant all the lands as
 
 *236
 
 far as the Indian boundary, but unwilling to pass that line. The sole object of the enactment, was to restrain' her citizens from passing it, by making void all surveys and grants of lands beyond it. It is therefore a reasonable construction of the act, to consider it as applying to surveys and grants, so far only as"they were contrary to law. There is a plain difference between a grant comprehending lands which may, with lands which may not be granted, and one made on a fraudulent misrepresentation or illegal consideration which extends to, and vitiates the whole instrument. Understanding this prayer asjmvolving the. validity of the grant, so far only as respects its extending in part into the Indian country, we think it ought to have been granted.
 

 The ,4th prayer, if not a repetition of the 3d, varies front it only by omitting the words “ including all the waters of the same;” consequently, the opinion which has been expressed on the third; is applicable to this.
 

 The principle that a patent conveying lands lying partly within and partly without the territory retained by the Indians, was void as to so much as lay within it and valid for the residue, was settled by this court in the case of Darnforth
 
 vs.
 
 Wear
 

 (a)
 

 .
 
 That decision was made pn a patent depending on the statutes of North Carolina, which contain, prohibitions at least as strong as those of Georgia.
 

 The 5th prayer states, that the plaintiff moreover gave evidence conducing to identify and prpve certain corner trees, station trees, and lines, of the said tract of land, grantee} to Bazil Jones aforesaid, before described, and including all the lands on the north and.east side of the south fork of the Oconee river, in the possession of the defendants. And thereupon, the counsel for the said plaintiff moved the coúrt to instruct the jury, that neither the want of the line and station trees required by any law, nor the omission of the surveyor to note on his plat the beginning corner, qor any' mistake in plaiting the water courses, nor any fraud, irregularity, negligence, or ignorance of the officers of government, prior to the issuing of the grant to Bazil Jones, under which
 
 *237
 
 the plaintiff derives title, did, or could, legally afféet the right of the plaintiff to recover; that the existence of the grant is, in itself, a sufficient ground to infer that every prer requisite has been performed; and that as to all irregularities, omissions, acts of fraud, negligence, or ignorance of the officers of government, prior to the emanation of the grant, the government of Georgia, and not the plaintiff claiming under her grant, must bear the consequences resulting from them; which instruction, the court j being divided in opinion, refused to give;
 

 This prayer is, in some of its parts, unexceptionable. In others, it is expressed in such vague and general berms, as to make it unsafe for any court to grant it. In the case of Polk’s lessee
 
 vs.
 
 Wendle
 
 (a)
 
 , this court decided that a grant raises a presumption that every prerequisite has been performed; consequently, that no negligence or omission of the officers of government anterior to its emanation can affect it. The part of the prayer which respects the defects supposed to be in the plat, speaks of the want of the line and station trees required by any law, without specifying the laws alluded to, and. the omission of the surveyor to note on his plat the beginning, and of any mistake in platting the water courses.
 

 The act for opening the land office contains no particular^ rules respecting plats; and the act which requires surveyors to note the beginning corner of their surveys, passed in.December 1789, long after the emanation of this patent. It would seem that the officer by whom the patent was issuedj Was the proper judge of all things apparent on the face of the plat, and that the patent itself presupposes that the plat was sufficient in law as to those requisites of which he could judge by inspection. This part of the instruction might have been given. But it is connected with a request that the court would instruct the jury thát no fraud on the part of the officers of government could affect the plaintiff’s title. It is not easy to peiceive the extent of this instruction; and it coul4 not, wé think, have been safely given.
 

 
 *238
 
 The 6th exception states, that the said plaintiff.moreover gave evidence conducing to prove that the title of Bazil Jones, the grantee of the.said land, had been regularly and legally conveyed to the lessor of the plaintiff in this action, before the commencement thereof; and that all the lands in the possession of the defendants, ánd of each of them, at the time of the service of the process m this action, were within the lines described by, the said grant to the said. Bazil Jones, and were On the north and east side of thé said south fork of the Oconee river. And thereupon, the said counsel for the plaintiff moved the court to instruct the, jury, that, upon the aforesaid evidence, if the jury believed the same, the plain-, tiff was, by law, entitled to recover-the premises in dispute'; -which instruction, the court, being divided in opinion, refused to give.
 

 This prayer states more ■ explicitly the,-facts contained in the 3d and 4th, and is understood to comé completely within the. opinion of the court on them.
 

 It is the opinion of this court that the circuit court erred in not instructing the jury that the grant under which the plaintiff made title was valid as to the lands in. possession of the defendants; ana that far.refusing to give this instruction the judgment of the. said circuit court ought to be reversed and the cause remanded, that a, venire facias de novo may." be awarded.
 

 (a)
 

 9
 
 Wheaton,
 
 673.
 

 (a)
 

 9
 
 Cranch,
 
 87. 8
 
 Wheaton,
 
 293.