LESSEE OF MARGARET LATTIMER AND OTHERS, PLAINTIFFS IN
ERROR, *vs.* WILLIAM POTEET, DEFENDANT IN ERROR.

Ejectment for forty-nine thousand acres of land in the state of North Carolina, claimed
by the plaintiffs under a grant from the state, dated 20th July, 1796, to William Cath-
cart, founded on entries made in the office of the entry taker, in the county of Bun-
combe, in the state of North Carolina, made after the 3d of February, 1795, within the
limits of the county. The land lay wholly within the limits of the territory specially
described and set forth in the fifth section of the act of 1783, entitled an act for opening
the land office of the state of North Carolina. The claim of the plaintiffs, in the eject-
ment was resisted on the ground that the grant under which the plaintiffs claimed, was, at
the time of its emanation, wholly within the territory allotted to the Cherokee Indians,
and was null and void; as such entries and grants were prohibited by the sixth section
of the act. It was held that the title under which the plaintiffs claim was invalid.
Construction of the treaties with the Cherokee Indians, relative to lands within the bound-
ary; and of the acts of the legislature of the state of North Corolina, relative to the occu-
pation and entry of lands within the Indian boundary.
It will not be denied that the parties to a treaty are competent to determine any dispute
respecting its limits. In no mode can a controversy of this nature be as satisfactorily
determined as by the contracting parties. If their language in the treaty shall be
wholly indefinite, or the natural objects called for are uncertain or contradictory, there
is no power but that which formed the treaty which can remedy such defects.
It is a sound principle of law, and applies to the treaty-making power of the government
of the United States, whether exercised with a foreign nation or an Indian tribe, that
all questions of boundary may be settled by the parties to the treaty: and to the exercise
of that high function of the government within its constitutional powers, neither the
rights of a state, or of an individual can be interposed.
The Indian title being a right of occupancy, the state of North Carolina had the power
to grant the fee in those lands subject to this right.

IN error to the Circuit Court of the United States for the District
of North Carolina.

This case was argued at January term, 1839, by Mr. Coxe for
the plaintiffs in error; and by Mr. Webster for the defendant. It
was held under advisement until this term.

The case is fully stated in the opinion of the Court.

Mr. Justice M'LEAN delivered the opinion.

This case comes before the Court on a writ of error to the Circuit
Court of North Carolina.

The lessors of the plaintiff brought their action of ejectment, to
recover the possession of forty-nine thousand nine hundred and
twenty acres of land, in Haywood county, and described in the
declaration by metes and bounds. On the trial, certain exceptions
were taken by the plaintiff to the rulings of the Court; and the
verdict being not guilty, a judgment in favour of the defendant was
entered. To revise this judgment, this writ of error is prosecuted.

The lessors of the plaintiff, to sustain their action, offered in evi-
dence a grant from North Carolina to William Cathcart, for the land
described in the declaration, dated the 20th July, 1796, and founded

on entries made in the entry-taker's office, of the county of Buncombe, in said state, in the year 1795, within the limits of said county. It was admitted that the title, if any, had descended to the lessors of the plaintiff, and that, at the commencement of the action, the defendant was in possession; and also, that the land was within the limits of the territory described in the fifth section of the act of North Carolina, 1783, entitled an act for opening the land office for the redemption of specie and other certificates, &c. And the great questions arising out of the instructions are, whether, at the dates of the entry and grant, the land was within the Indian country; and if it was, whether the entry and grant were void.

The limits of the Indian country, within the state of North Carolina, were established by treaties made between the United States and the Cherokee tribe of Indians.

The first treaty was concluded at Hopewell, the 20th November, 1785. The fourth article of this treaty declared, "that the boundary allotted to the Cherokees for their hunting grounds, between the said Indians and the citizens of the United States, &c., shall begin at the mouth of Duck river, on the Tennessee; thence running northeast to the ridge dividing the waters running into Cumberland from those running into the Tennessee, thence easterly along the said ridge to a northeast line, to be run, which shall strike the river Cumberland forty miles above Nashville; thence along the said line to the river; thence up the said river to the ford where the Kentucky road crosses the river; thence to Campbell's line, near Cumberland Gap; thence to the mouth of Cloud's creek on Holston, thence to the Chimney-top mountain; thence to Camp creek near the mouth of Big Limestone on Nalichuchey; thence a southerly course six miles to a mountain; thence south to the North Carolina line; thence to the South Carolina Indian boundary; and along the same southwest over the top of the Occunna mountain, till it shall strike Tugalo river; thence a direct line to the top of the Currahee mountain; thence to the head of the south fork of the Occunna river."

The treaty of Holston, which was concluded the 2d July, 1791, altered the limits, as established by the Hopewell treaty, and declared that "the line should begin at the top of the Currahee mountain, where the creek line passes it; thence a direct line to Tugalo river; thence northeast to the Occunna mountain, and over the same along the South Carolina Indian boundary to the North Carolina boundary; thence north to a point from which a line is to be extended to the river Clinch, that shall pass the Holston at the ridge which divides the waters running into Little river from those running into the Tennessee; thence up the river Clinch to Campbell's line, and along the same to the top of Cumberland mountain; thence a direct line to the Cumberland river, where the Kentucky road crosses it; thence down the Cumberland river to a point from which a southwest line will strike the ridge which divides the waters of Cumberland from those of Duck river, forty miles above Nashville;

thence down the said ridge to a point from whence a southwest line will strike the mouth of Duck river."

" And in order to preclude forever all disputes relative to the said boundary, the same shall be ascertained and marked plainly, by three persons appointed on the part of the United States, and three Cherokees on the part of their nation."

Another treaty was made with the Cherokees, at Philadelphia, the 26th June, 1794, in which it was stated that the treaty of Holston had not been fully carried into effect; and in the second article it was "stipulated that the boundaries mentioned in the fourth article of the said treaty shall be actually ascertained and marked in the manner prescribed by the said article, whenever the Cherokee nation shall have ninety days' notice of the time and place at which the commissioners of the United States intend to commence their operation."

The whole extent of the line designated by this treaty, never appears to have been run and marked. Some parts of it were not run, because the country through which it passed was mountainous and uninhabitable. On the 7th October, 1792, (1 American State Papers, Indian Affairs, 630,) Governor Blount having given the notice to the Cherokees required by the treaty, under the directions of the Secretary of War, instructed David Campbell, Charles M'Clung, and John M'Kee, commissioners for extending the line between the United States and the Cherokees, according to the treaty of Holston, to meet the next day at Major Craig's, on Nine Mile creek, to extend the line. And they were instructed in case the commissioners appeared on the part of the Indians to run the line; but. if the Indians did not attend, they were required to examine where the ridge which divides the waters running into Little river from those running into the Tennessee, strikes the Holston; and extend the line from thence to Clinch river; and again from the ridge to the Chilhowee mountain, paying strict regard to the treaty.

In their report, the 30th November ensuing, the commissioners say, that " the commissioners on the part of the Cherokees did not attend; and we proceeded to examine with great attention for the ridge which divides the waters of the Tennessee from those of Little river, and tracing it, found it a plain leading ridge, and that it struck the Holston at the mouth; but, having heard it suggested that the Indians had in contemplation, at the time the treaty was made, a ridge which they supposed would strike the Holston higher up, we did not content ourselves, but retraced the ridge, and examined well the south bank of the Holston, and the result was, that we were perfectly convinced that the ridge which divides the waters of Tennessee and Little river, strikes the Holston at the mouth, and at no other part."

" We then proceeded to run, but not to mark, a line of experiment, from the point of the ridge in a southeast direction to the Chilhowee mountain, distance seventeen and a half miles, and again from thence to the Clinch, in a northwest direction, distance nine miles, and

found that line, continued to the southeast, would intersect the Tennessee, shortly after it crossed the Chilhowee mountain, consequently take away all the Indian towns lying along the south side of the Tennessee. This showed the necessity of turning the direction more to the east and west; and it is our opinion that a line extended from the point of the ridge aforesaid south sixty degrees east to Chilhowee mountain, again from the point north sixty degrees west, will form the true line from Chilhowee mountain to Clinch, between the United States and the Cherokees, according to the treaty of Holston. The more fully to elucidate this report, we present you with a map, which we believe is nearly correct, on which both the lines are laid down."

This line left several white settlers within the Indian lands.

In transmitting this report to the War Department, Governor Blount remarks, " As the geography of the country generally cannot be known to you, there being no correct map of it, I think it necessary to inform you that the country to the east or rather southeast of Chilhowee mountain, through which the line reported upon, if continued beyond it, will pass, for fifty or sixty miles is an entire bed or ledge after ledge of mountains, that is, until it intersects the line which is to be extended south from the north boundary of North Carolina, near which no settlements can be formed; hence I conclude it will not be essential to extend it. That which the line reported on will intersect, if continued, meaning that which runs south from the north boundary of North Carolina, I caused to be run, and marked about sixty miles from the mouth of M'Namee's creek to Rutherford's war trace, by Mr. Joseph Harden, in the course of last winter. Harden did not run north, as required by the treaty of Holston, but south, according to the treaty of Hopewell." The writer then states certain parts of the line, which, in his opinion, need not be run.

In a letter from Governor Blount to the Secretary of War, (1 American State Papers, Indian Affairs, 629,) dated July 15th, 1791, in reference to the treaty of Holston, concluded the 2d of the same month, says, " According to my instructions, I proposed that the ridge dividing the waters of Tennessee from those of Little river, should form a part of the boundary; but the Indians would not agree to it, but insisted on a straight line which should cross the Holston where that ridge should strike it; and were so firmly fixed in their determination, that I could not prevail on them to agree to any other." And in another letter from Governor Blount to the Secretary, (same page,) dated 2d March 1792, he says, " I can't help remarking, that I proposed at the treaty that the ridge should be the line. You will recollect that I was so instructed; and the chiefs were unanimously opposed to it, saying it should be a straight line; and that it was an evidence that my heart was not straight that I wanted a crooked line. The difficulty will be in running the line to ascertain where the ridge that divides the waters of Little river and Tennessee will strike the Holston; for, it seems, the white people

[Lattimer et al. *vs.* Poteet.]

cannot agree upon it—a circumstance unknown to me at the time
the Indians proposed it; but from the best information I can obtain,
I am induced to believe it will prove to be lower down than they
expected; and, in that case, it is my opinion that the words of
the treaty ought not to be so strictly adhered to as to give them
any great degree of dissatisfaction." In his answer of 22d April,
1792, the Secretary of War says, "I am commanded by the Presi-
dent of the United States, to whom your letters are constantly sub-
mitted, to say, with respect to your remarks upon the line at Little
river, that you will be pleased to make a liberal construction of that
article, so as to render it entirely satisfactory to the Indians, and at
the same time as consistently as may be with the treaty."

On the 2d October, 1798, the treaty of Tellico was entered into,
which contained the following preamble: "Whereas the treaty
made and concluded on Holston river, on the 2d of July, 1791,
between the United States and  Cherokee nation of Indians, had
not been carried into execution for some time thereafter, by reason
of some misunderstanding which had arisen; and whereas, in order
to remove such misunderstanding, and to provide for carrying the
said treaty into effect, and for re-establishing more fully the peace
and friendship between the parties, another treaty was held, made
and concluded, by and between them, at Philadelphia, the 26th of
June, 1794; in which, among other things, it was stipulated that the
boundaries mentioned in the fourth article of the said treaty of Hol-
ston should be actually ascertained and marked, in the manner pre-
scribed by the said article, whenever the Cherokee nation should
have ninety days' notice of the time and place at which the commis-
sioners of the United States intended to commence their operations:
and whereas further delays in carrying the said fourth article into
complete effect did take place, so that the boundaries mentioned and
described were not regularly ascertained and marked until the latter
part of the year 1797; before which time, and for want of knowing
the direct course of said boundary, divers settlements were made by
citizens of the United States upon the Indian lands, over and beyond
the boundaries so mentioned and described in the said article, and
contrary to the intention of the said treaties; but which settlers were
removed from the said Indian lands, by authority of the United
States, as soon after the boundaries had been so lawfully ascertained
and marked as the nature of the case had admitted."

The fourth article declares, "In acknowledgment for the protec-
tion of the United States, and for the considerations hereafter ex-
pressed and contained, the Cherokee nation agrees, and does hereby
relinquish and cede to the United States, all the lands within the
following points and lines, viz. from a point on the Tennessee river,
below Tellico blockhouse, called the Wildcat Rock, in a direct line
to the Militia Spring, near the Maryville road leading from Tellico.
From the said spring to the Chilhowee mountain, by a line so to be
run as will leave all the farms on Nine-mile creek to the northward
and eastward of it; and to be continued along Chilhowee mountain

until it strikes Hawkins' line. . Thence along the said line to the Great Iron mountain; and from the top of which a line to be continued in a southeasterly course to where the most southerly branch of the Little river crosses the divisional line to Tugalo, river; and from the place of beginning, at the Wildcat Rock, down to the northeast margin of the Tennessee river, (not including islands,) to a point or place one mile above the junction of that river with the Clinch; and from thence by a line to be drawn, in a right angle, until it intersects Hawkins' line leading from Clinch. Thence down the said line to the river Clinch; thence up the said river to its junction with Emmery's river; and thence up Emmery's river to the foot of Cumberland mountain, &c."

The 5th article provided that this line should be run and marked under the superintendence of commissioners appointed by both parties; and that maps should be made, one of which was to be deposited in the War Office.

The Indian boundary established by the treaty of Holston calls for certain lines and natural objects, which, it would seem, give as much certainty to a boundary as could well be given, short of a marked line or water course.

It was to begin at the top of the Currahee mountain, where the Creek line passes it. This mountain is in the state of Georgia, and is designated on the maps of that state; and "where the Creek line passes it," is easily ascertained. From this point the line was to run direct to Tugalo river, an object well known, and marked on the maps; thence north-east to the Occunna mountain, and over the the same along the South Carolina Indian boundary, to the North Carolina boundary. This mountain is designated on the map, and the boundaries called for, being established, were known. From the North Carolina southern boundary, the line was to run north to a point, from which a line is to be extended to the river Clinch, that shall pass the Holston at the ridge which divides the waters running into Little river from those running into the Tennessee.

The point at which the line shall strike the Holston, at the ridge, not being certain, gave rise to some controversy shortly after the date of the treaty. The commissioners appointed to run the line in 1792, found that by tracing the ridge, it led to the junction of the Holston and Tennessee rivers; and consequently, if the termination of the ridge was the place, within the meaning of the treaty, where the line should cross, it must cross the Holston at its mouth. But that this was not the construction given to the treaty by the parties to it is clear, from the letters of Governor Blount, who negotiated it, to the Secretary of War. The same day the treaty was concluded, he writes: I have concluded a treaty which includes all the white settlers, except those south of the ridge dividing the waters of Little river from those of Tennessee. And again, July 15th, 1791, he says, " I proposed that the ridge dividing the waters of Tennessee from those of Little river should form a part of the boundary; but the Indians would not agree to it; and were so firmly fixed in their determination, that I

could not prevail on them to agree to any other. This line is not so limited, as to the point at which it shall leave the north line, or at which it shall strike the Clinch, but that it may be so run as either to include or leave out the settlers south of the ridge; the only stipulations respecting it are, that it shall cross the Holston at the ridge.'' And again, in a letter of 2d March, 1792, " I can't help remarking, that I proposed at the treaty that the ridge should be the line. You will recollect that I was so instructed, and the chiefs were unanimously opposed to it, saying it should be a straight line.'' And he says that "the ridge will strike the Holston lower down than was expected; and, in that case, it is my opinion that the words of the treaty ought not to be so strictly adhered to, as to give them any great degree of dissatisfaction.'' In his answer, the Secretary of War says, by command of the President, " You will make a liberal construction of that article, so as to render it entirely satisfactory to the Indians.'' The Indians remonstrated, and required the white settlers south of the ridge to be removed.

In the talk of the President, dated 27th August, 1798, to the Cherokees, which was sent to them preparatory to the treaty of Tellico, he says, it was expected that the Holston treaty line would have included a great proportion of the frontier white settlers, but it proved otherwise when the line was run. The words, " shall pass the Holston at the ridge which divides the waters running into Little river from those running into the Tennessee,'' do not necessarily imply that the line shall cross the Holston at the point where the ridge terminates. Little river falls into the Holston, and the general course of the ridge would strike the Holston some distance above its mouth. And when we consider that the Indians refused to make the ridge the boundary, and would agree to no other than a straight line; and that neither party seems to have considered the place of crossing at the mouth of the Holston, we think, in the language of the President, through the Secretary of War, " that a liberal construction of this clause of the treaty should be given.''

But it is unnecessary to consider the correspondence of Governor Blount, the report of the commissioners of 1792, or the words of this article of the treaty, with the view to give to it a satisfactory construction; as the parties in the treaty near Tellico have given to it a practical construction.

In this treaty, the parties say, that for certain causes enumerated, the boundaries mentioned and described in the fourth article of the treaty of Holston, " were not regularly ascertained and marked until the latter part of the year 1797.''

The second article provides, that the treaties subsisting between the present contracting parties, are acknowledged to be of full and operating force; together with the construction and usage under their respective articles, and so to continue. And in the third article it is declared, that the limits and boundaries of the Cherokee nation, as stipulated and marked by the existing treaties between the parties, shall be and remain the same, where not altered by the present treaty.

[Lattimer et al. *vs.* Poteet.]

The object of the government in entering into this treaty was, to purchase the Indian territory, into which white settlers had intruded, at and near Nine Mile creek, and perhaps at other places. The line established was run and marked, and we have the original map, or a copy of the survey, before us, which was returned to the War Department.

That this purchase was of territory not included in the boundaries of the Holston treaty, will not be disputed. And, from the language of the third article, it is clear, that the parties did not intend to establish an entirely new boundary, but to make such alterations of the Holston boundary as should secure the object of the United States.

The land lying southwest of the Holston boundary belonged to the Indians; and it was a part of this land that was purchased by the treaty of Tellico. Of course, this purchase extended from the Holston treaty line southerly. For no one can suppose that a strip of Indian land would be left between the treaty lines of Holston and Tellico. The facts go clearly to show, that the Tellico purchase was up to the Holston line, and that the part of that line to which the purchase did not extend, was designated; and the point where the Tellico line varied from it, so as to include the lands purchased, is marked on the map. And this shows the propriety of the language used in the third article of the Tellico treaty; that " the boundaries should remain the same as established by existing treaties, where not altered by the present treaty."

The line of this treaty was to begin " at the Wildcat Rock, in a direct line to the Militia Spring, near the Maryville road, leading from Tellico. From the said spring to the Chilhowee mountain, by a line so to be run as will leave all the farms on Nine Mile creek to the northward and eastward of it; and to be continued along Chilhowee mountain until it strikes Hawkins' line." This line is laid down on the map, and although it is not called the southern boundary of the Holston treaty, yet it is recognised as the northern boundary of the territory purchased; and consequently must be the Holston boundary. Hawkins' line extends from Clinch, crossing the Holston some miles above its mouth, and runs between the waters of Little river and those of the Tennessee, as appears from the map, and continues until it reaches the summit of the Great Iron mountain. At this point a monument is erected; but if the line were extended beyond this easterly, it was not, probably, marked; and it is not laid down on the plat. It is probable that the original survey of this line was destroyed when the War Office was burnt, in 1800.

From the Wildcat Rock, the Tellico treaty calls " to run down the northeast margin of the Tennessee river, to a point or place one mile above the junction of that river with the Clinch; and from thence by a line to be drawn in a right angle until it intersects Hawkins' line leading from Clinch." Here is another recognition of this line as the northern boundary of the Indian lands; and consequently, the line established by the Holston treaty.

And the Tellico treaty calls again, after striking Hawkins' line, by running near Nine Mile creek, and along Chilhowee mountain, to run with it to the top of the Great Iron mountain. From this point the new treaty line varies from a direct course, and continues "southeasterly to where the most southeasterly branch of Little river crosses the divisional line to Tugalo river."

It is only necessary to compare the course and objects here designated with the southeastern calls of the Holston treaty line, to see that the Tellico line includes a large tract of country not included by the Holston line. The Holston line, after striking the Tugalo river, runs northeast to the Occunna mountain, and over the same along the South Carolina Indian boundary, continuing a northeasterly direction, until it strikes the North Carolina boundary; thence north to a point which shall intersect a line to be extended from the river Clinch, that shall pass the Holston at the ridge.

The Tellico line, runs southeasterly, until it strikes the divisional line to Tugalo river. The Holston line calls to run along this divisional line, northeasterly; so that from this point these lines diverge until the Holston line shall reach the point of connection with the line drawn from the Clinch.

These boundaries, from the point of intersection on the top of the Great Iron mountain to the point of intersection on the South Carolina Indian boundary, include a large tract of country. And this tract, with the one designated by Hawkins' line, the Tennessee Nine Mile creek, and the Clinch, &c., constituted the territory purchased by the Tellico treaty.

This recognition of Hawkins' line as the Indian boundary, was in 1798, only eight years after the boundary was established by the treaty of Holston, and one year after the line is declared to have been run and marked. The facts in regard to this line were recent, and of course fresh in the recollection of the contracting parties. It was a matter about which they could not be mistaken. They say the Holston line was not run and marked until the latter part of the year 1797, and the United States purchase the Indian lands up to Hawkins' line. It is true, this line is not in terms said to be the boundary established by the Holston treaty, but in the most solemn form it is recognised to be the boundary of the Indian lands, by purchasing those lands up to it; and by tracing it as the boundary, beyond the purchase on Nine Mile creek, to the top of the Great Iron mountain. It could then be no other than the Holston treaty line, for in that part of the country there was no other Indian boundary before the treaty of Tellico.

Whatever doubt may have existed as to Hawkins' line being the true Indian boundary, independently of this treaty; there would seem to be no ground for doubt under the recognitions of that line in this treaty.

It is contended that the Holston line should run from the Clinch, crossing the Holston river at its mouth, and continue on in the same direction, until it shall strike the North Carolina boundary.

This would not only disregard the solemn acts and recognitions of the parties to the Holston treaty, in forming the treaty of Tellico; but it would also disregard the language of the former treaty. It calls for a line running north, from North Carolina boundary, to a point that shall intersect a line drawn from the Clinch, crossing the Holston at the ridge. This call to run north, by this construction, is wholly disregarded. And on what ground is this construction attempted to be maintained?

The answer must be, simply on the call for the line to cross the Holston river at the ridge. A call in itself somewhat indefinite, and which was never construed by the Indians to mean the mouth of the Holston: nor was such a construction insisted on by the United States, either at the time the treaty was concluded or afterwards.

The Hopewell treaty line, in running a southerly course, strikes the northern boundary of North Carolina, near Nalichuchey, and extends south to the North Carolina line, and thence to the South Carolina Indian boundary.

From a point in the Hopewell line, near where it strikes the southern boundary of North Carolina, a line seems to have been run by General Pickens, north seventy-six west to the state road leading from Ashville to Clayton, in Georgia. But this line has no connection with any other, and does not appear to have been regarded, either by the United States or the Indians, as any part of the line established by the Holston treaty. It was certainly not run agreeably to the treaty.

The evidence establishes very satisfactorily, that Hawkins' line, so far as it goes, is the boundary of the Holston treaty; and it is very clear, from the language of the treaty, that from the Clinch, crossing the Holston river at the ridge to the point at which this line will intersect a line run north from the southern boundary of North Carolina, a straight line was intended. Of this no doubt can exist; and it is only necessary to extend Hawkins' line from the top of the Great Iron mountain eastward to the point where it shall intersect a line run north from the place where the South Carolina Indian boundary strikes the southern boundary of North Carolina. This, we feel authorized to say, from the evidence before us, constitutes the boundary of the Holston treaty.

It is argued, that it was not in the power of the United States and the Cherokee nation, by the treaty of Tellico in 1798, to vary in any degree the treaty line of Holston; so as to affect private rights, or the rights of North Carolina.

The answer to this is, that the Tellico treaty does not purport to alter the boundary of the Holston treaty, but by the acts of the parties, this boundary is recognised. Not that a new boundary was substituted, but that the old one was substantially designated.

Will any one deny that the parties to the treaty are competent to determine any dispute respecting its limits. In what mode can a controversy of this nature be so satisfactorily determined as by the contracting parties. If their language in the treaty be wholly in-

definite, or the natural objects called for are uncertain or contra-
dictory, there is no power but that which formed the treaty which
can remedy such defects.   And it is a sound principle of national
law, and applies to the treaty-making power of this government,
whether exercised with a foreign nation or an Indian tribe, that all
questions of disputed boundaries may be settled by the parties to
the treaty.   And to the exercise of these high functions by the
government, within its constitutional powers, neither the rights of a
state nor those of an individual can be interposed.   We think it
was in the due exercise of the powers of the executive and the
Cherokee nation, in concluding the treaty of Tellico, to recognise in
terms, or by acts, the boundary of the Holston treaty.

It is agreed, that if Hawkins' line shall be extended as the Hol-
ston treaty line, the land in controversy lies within the Indian coun-
try.   And we are now to consider whether, in this view, the entry
and patent are void.  The Indian title being only a right of occu-
pancy, the state of North Carolina had the power to grant the fee in
the lands, subject to this right.   The land was entered in 1795, and
patented the 20th July, 1796.

By the fifth section of the act of North Carolina, for opening the
land office for the redemption of specie and other certificates, and
discharging the arrears due to the army, passed in 1783, it is pro-
vided, " That the Cherokee Indians shall enjoy all the lands lying
within certain bounds, forever."   And the sixth section provides,
" That no person shall enter and survey any lands within the
bounds set apart for the said Cherokee Indians, under the penalty
of fifty pounds specie for every such entry so made, to be recovered
in any Court of law in this state, &c.; and all such entries and
grants thereupon, if any should be made, shall be utterly void."

In 1784, (North Carolina Laws, 482, ch. 14,) the above act was
amended, by authorizing the appointment of three surveyors, viz.:
" One to survey those lands that lie between the bounds hereafter
described for the surveyor of Green county, and Cumberland moun-
tain; one to survey the lands that lie between the Cumberland
mountain and the river Tennessee; and one to survey the lands
that lie between the Tennessee and the Mississippi river."

The boundaries here described cover the land reserved by the act
of 1783, for the Cherokee Indians; but there is no express repeal
of the fifth and sixth sections of that act; and as the act of 1784
can operate upon lands not reserved in the above sections, they
cannot be held to have been repealed by implication.   The Supreme
Court of North Carolina has decided in several cases, that the
above sections remained in force; and that the entries and grants
made for lands within the territory described, before the Indian title
was extinguished, were void.  1 Murphy, 162, 164.  Con. Rep.
434.   2 N. Carolina Law Repository, 451.   3 Hawks. 163.

We come now to examine the exceptions of the plaintiffs in the
Circuit Court; and having considered and decided the controverted
points, it will not be necessary to examine the exceptions in detail.

[Lattimer et al. *vs.* Poteet.]

The first exception was to the refusal of the Court to instruct the jury that the sixth section in the above act of 1783, had been repealed: and we think the Court did not err in refusing to give the instruction.

The second instruction asked was, " that the treaty line of Holston ought to run with the South Carolina Indian boundary, called for in the treaty of Hopewell, made on the 28th of November, 1786, until it should reach the termination of the line described in that treaty, running from the North Carolina boundary to the South Carolina Indian boundary; and on reaching that line, should then run with the same reversed to the North Carolina boundary;" which instruction was not given.

Some doubt arises from the structure of this instruction, whether the reversed line referred to is the Hopewell treaty line, or the South Carolina Indian boundary. From the maps, the latter line strikes the southern boundary of North Carolina, and from the language of the Holston treaty, this fact seems to have been within the knowledge of the parties. The call is to run " along the South Carolina Indian boundary, to the North Carolina boundary."

In the Hopewell treaty line, the southern boundary of North Carolina is not named, but the northern; from which the line runs to the South Carolina Indian boundary. Now the instruction must have referred to the southern boundary of North Carolina; and if the Indian boundary strikes this line, it is difficult to perceive what application to the facts the instruction would have. But if the instruction referred to the Hopewell treaty line, it was not called for in the Holston treaty; and under the circumstances of the case, we are not prepared to say that there was error in refusing to give the instruction.

And we think there was no error in refusing to give the third, fourth, and fifth instructions prayed by the plaintiffs' counsel. Nor do we perceive any error of which the plaintiffs can complain, in the first, second, third, fourth, fifth, and sixth instructions given by the Circuit Court, on the prayer of the defendant.

The judgment of the Circuit Court is affirmed.

Mr. Chief Justice TANEY.

I agree with the majority of the Court in affirming these judgments; but I dissent from some of the principles upon which they have founded their opinion.

The Court (as I understand the opinion) consider Hawkins' line to be the established boundary line of the treaty of Holston; they think it is recognised as such in the subsequent treaty of Tellico; and that being thus recognised by the political department of the government, the Court (according to the principles deduced in Garcia *vs.* Lee and Foster, and Elam *vs.* Nielson) must also regard it as the true boundary line; and must treat it as such from the date of the treaty of Holston, in any question of property that may come before them.

If the legislative or executive departments of the government, by

any clear and unequivocal act, had declared Hawkins' line to be the true line of the treaty of Holston, I should concur with the majority of this Court. But I do not find any act of that description by any department of the government. In the cases of Foster and Elam vs. Neilson, and of Garcia vs. Lee, an act of Congress had been passed describing particularly the boundary line-therein mentioned, and declaring it to be the true line of that treaty. But in this case we have no act of the legislative or executive departments of the government, recognising the line run by Hawkins as the treaty line. It is true that in the subsequent treaty of Tellico, the parties, in describing the boundaries of this new treaty, call upon two occasions, for Hawkins' line, and upon both of them run some distance with it. But there is no expression in this treaty which recognises the line thus called for as the boundary line of the treaty of Holston. It is mentioned and referred to merely as a known point, like other places called for in this treaty; and the lines spoken of, are run with, merely as known lines. But so far from declaring it to be the boundary line described in the treaty of Holston, the treaty of Tellico does not even say that it was run by Hawkins as the boundary; nor is it described as having any connexion whatever with the treaty of Holston. It is called for as a line known in the country, and which on some occasion or other had been run by Hawkins; but when run, or for what purpose, cannot be gathered from any expressions in the treaty of Tellico. We know, indeed, from public historical documents, that Hawkins' line is one of the many efforts that were made to fix a certain boundary between North Carolina and the Cherokee Indians, from the vague and imperfect descriptions contained in the treaty of Holston. Other lines were run for this purpose besides that of Hawkins. And we have no evidence that Hawkins' line, or any other line was ever acknowledged, either by the Cherokees or the United States, as the correct one, unless the expressions in the treaty of Tellico are deemed to be sufficient for that purpose. The treaty of Holston was made in 1791; the treaty of Tellico in 1798: and the last mentioned treaty recites that delays had taken place in carrying the former into effect, so that the boundaries were not regularly ascertained and marked, until the latter part of the year 1797. But the treaty of Tellico gives no description of the marks or of the boundaries thus ascertained; nor does it state by whom the lines were run, or the boundaries ascertained and marked. I cannot think that this recital, and the calls before mentioned for Hawkins' line, are sufficient of themselves to establish as a matter of law, that this line is the true boundary of the treaty of Holston; and I must dissent from that part of the opinion of the Court which holds that doctrine. At the trial of this case in the Circuit Court, the jury were instructed, " that the treaty of Tellico is an admission by the parties that the line of the treaty of Holston has been ascertained and marked, and furnishes strong evidence that the lands reserved to the Cherokees by the treaty of Tellico were reserved by the treaty of Holston, but does not estab-

lish the lines of Pickens and Hawkins, if erroneous in fact." I con-cur entirely in this opinion of the Circuit Court: and as I perceive nothing in the other instructions of that Court, as stated in the exception, of which the plaintiff has a right to complain, I agree with a majority of my brethren in affirming its judgment.

Mr. Justice WAYNE dissented.

Mr. Justice CATRON.

I think the treaty of Tellico did not settle the line of the treaty of Holston, from the Holston river to the top of the Iron mountain; and certainly not east of the Iron mountain. So that it must now be extended in a direct course, and as a unit, to the line of intersection, running north from the North Carolina line.

The land in controversy was granted before Hawkins' line was run; and which was not marked in execution of the treaty of Holston; no one pretends it was; the Indians were not present, which was indispensable to give binding validity to the line.

To say it was conclusive on one of the contracting parties, the United States, and void as to the other, the Cherokees, at the time it was run and marked, would be a most harsh assumption in regard to those who acquired titles before it was run; admitting, that the contracting parties had the power afterwards to settle its position, but which they never saw proper to do. The truth is not open to question, that the Holston treaty line never was ascertained south-east of the Iron mountain; and with due deference to the opinion of others, I think not west of it, in execution of, and in conformity to, the treaty. Why Hawkins' line was run, the history of our relations with the Cherokees does not with any distinctness show. From personal position, I happen to know, through those who lived at that date, and by reputation, that it was run to fix some line beyond which it was intended the white population should not be permitted to obtrude, further than they had done at the time the line was marked, extending to a few settlers on Nine Mile creek. But that Hawkins' line was run as a conclusive boundary in execution of the treaty of Holston, of 1791, or for any further purpose than to hold the whites in check, for the sake of peace and convenience, it is impossible to affirm as a matter of history; and as such it must be affirmed, there not being any evidence in this cause.

I repeat: The land in controversy was granted before this line was run; Hawkins' ceased running far west of where the land is situated; on the east a line was run and marked by Pickens, which, when marked, was as authentic as that marked by Hawkins, for any thing we know; the object of each line no doubt was the same: neither concluding the Cherokees previous to the treaty of Tellico; which treaty superseded the necessity of ascertaining and marking the true line of the treaty of Holston, from the point east, from where Hawkins' ceased running. From this point, (the top of the Iron mountain,) it continues a line not fixed by the contracting par-

B 2          3

[Lattimer et al. *vs.* Poteet.]

ties; and the United States and Cherokees having ceased to have any interest in its ascertainment after the treaty of Tellico was made, North Carolina had the right to ascertain and settle it for herself, according to some one construction of the treaty of 1791; and by which her grantees should be bound, if so settled : or, she may have recognised Pickens' as the true line of the treaty; if so, I think the state and her grantees bound by the recognition : so this Court held in Patterson *vs.* Jenks, 2 Peters, in a similar case; and for reasons manifestly just. Truly, Pickens' line must be proved to be in conformity to some one construction of the treaty; and that it is in conformity to the most favourable construction for North Carolina, there can be little doubt.

To extend Hawkins' line eastwardly as the true boundary of the treaty of Holston, will manifestly tend to disturb titles made in reference to another line; as it will (when extended) split Buncombe county, long settled, almost in the centre.

I do not, therefore, find myself capable of concurring with the majority of the Court in its extension.

Again : If North Carolina has construed this treaty, and for herself settled this boundary, by her subsequent acts manifesting her understanding of it, I should not hesitate to adopt that construction, unless in violation of the plain terms of the treaty : I use the language holden by this Court in Patterson *vs.* Jenks, 2 Peters, 231. But the misfortune is, the bill of exceptions sets forth not a single fact; and the correctness of the instructions of the Court below cannot therefore be tested by the evidence given on the trial; whether they are right or wrong, it is impossible for me to say; they may have been mere abstractions, especially as to the main fact, whether or not North Carolina had by her acts fixed a boundary for herself, be it Pickens' line or another. It follows, I feel bound to concur with a majority of the Court, in affirming the judgment, on the presumption that the instructions were proper.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of North Carolina, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.