382 F.3d 245
 SENECA NATION OF INDIANS, Plaintiff-Appellant,
Tonawanda Band of Seneca Indians, United States of America, Plaintiffs-Intervenors-Appellants,
v.
The State of NEW YORK, New York Thruway Authority, John R. Platt, Executive Director, New York Thruway Authority, Defendants-Appellees,
Moore Business Forms Corp., individually and as a representative of a class of landowners similarly situated, Defendant-Appellee-Cross-Appellant,
George E. Pataki, Governor, State of New York, Bernadette Castro, Commissioner, Parks, Recreation and Historic Preservation, Ronald W. Coan, Director, Erie County Industrial Development Agency, John Cahill, Commissioner, New York Department of Environmental Conservation, Joseph Boardman, Commissioner, New York Department of Transportation, Erie County, Individually and as a representative of class of landowners and similarly situated, Moore Business Forms, Individually and as a representative of a class of landowners similarly situated, Indicom, Inc., Individually and as a representative of a class of landowners similarly situated, Rado-Mart Holdings, U.S., Inc., Individually and as a representative of a class of landowners similarly situated, Ilona H. Lang, Individually and as a representative of a class of landowners similarly situated, Robert W. Weaver, Individually and as a representative of a class of landowners similarly
situated, Francis B. Pritchard, Individually and as a representative of class of landowners similarly situated, Defendants.
 Docket No. 02-6185(L).
 Docket No. 02-6195(XAP).
 Docket No. 02-6197(C).
 Docket No. 02-6213(C).
 United States Court of Appeals, Second Circuit.
 Argued: October 20, 2003.
 Decided: September 9, 2004.
 
 Appeal from the United States District Court for the Western District of New York, Richard J. Arcara, Chief Judge.
 
 
 1
 Jeanne S. Whiteing, Whiteing & Smith, Boulder, CO, and Arlinda F. Locklear, Jefferson, MD (Steven M. Tullberg, Alexandra C. Page, Indian Law Resource Center, Washington, DC, on the brief), for Plaintiff-Appellant Seneca Nation of Indians and Plaintiff-Intervenor-Appellant Tonawanda Band of Seneca Indians.
 
 
 2
 Samuel C. Alexander (William Lazarus, Ellen Durkee, on the brief), Environment & Natural Resources Division (Thomas L. Sansonetti, Assistant Attorney General, on the brief), United States Department of Justice (Mary Anne Kenworthy, Office of the Solicitor, Department of the Interior, on the brief), Washington, DC, for Plaintiff-Intervenor-Appellant United States.
 
 
 3
 Peter B. Sullivan, Assistant Attorney General (Eliot Spitzer, Attorney General, Caitlin J. Halligan, Solicitor General, Peter H. Schiff, Senior Counsel, Andrew D. Bing, Assistant Solicitor General, on the brief), State of New York (Frederick A. Wolf, Erie County Attorney, Frederick G. Attea, Assistant County Attorney, Buffalo, NY; Michael B. Powers, Phillips, Lytle, Hitchock, Blaine & Huber, on the brief), Buffalo, NY, for Defendants-Appellees.
 
 
 4
 Gus P. Coldebella (Anthony M. Feeherry, P.C., Andrea L. Studley, Mark S. Puzella, Brett C. Gerry, on the brief), Goodwin Proctor LLP, Boston, MA, for Defendant-Appellee-Cross-Appellant.
 
 
 5
 Before: OAKES, MESKILL, and B.D. PARKER, Circuit Judges.
 
 B.D. PARKER, JR., Circuit Judge:
 I. Introduction
 
 6
 This case concerns the legality of the acquisition by the State of New York of Niagara River islands (the "Islands") in 1815 from the Seneca Nation of Indians[1] for $1,000 and "an annuity of $500.00 to be paid ... each year forever hereafter."[2] The Senecas and Intervenor-Appellant the United States, as trustee for the Senecas, sued to invalidate the transaction on the ground that it violated the Non-Intercourse Act, which bars conveyances by Indians to non-Indians unless made or ratified by Congress. See 25 U.S.C. § 177 (2001).[3] It is undisputed that the sale did not receive Congressional approval. What is disputed is whether New York already had title to the Islands when it ostensibly purchased them from the Senecas. If it did, the transaction did not violate the Non-Intercourse Act.
 
 
 7
 The District Court for the Western District of New York (Arcara, J.), on cross-motions for summary judgment and largely on stipulated facts, concluded that, for two reasons, New York had acquired fee title to the Islands long before the 1815 Transaction. See Seneca II, 206 F.Supp.2d at 453. First, the Court held that the Senecas' aboriginal title[4] had been extinguished either by the 1764 Treaties of Peace between Great Britain and the Senecas, which transferred title from the Senecas to the British Crown, or by the 1784 Treaty of Fort Stanwix, which extinguished the Senecas' title and passed it to New York. Second, it held that the 1794 Treaty of Canandaigua between the United States and the Senecas did not transfer the Islands back to the Senecas. See id. at 542. For many of the reasons expressed in the District Court's thoughtful and comprehensive opinion, we affirm.
 
 II. Procedural History
 
 8
 The proceedings in this case span a decade.[5] The claim itself is much older, dating back to an Indian Claims Commission (ICC) proceeding brought by the Senecas against the United States in the 1950s. See Seneca Nation of Indians v. United States, 20 Ind. Cl. Comm. 177 (1968); see also Seneca II, 206 F.Supp.2d at 454, 498-501 (summarizing the litigation and the related ICC proceeding).
 
 III. Background
 
 A. The Niagara Region
 
 
 9
 The Niagara River, which forms part of the present-day boundary between the United States and Canada, is a non-tidal, freshwater river, connecting Lakes Erie and Ontario. It runs in a northerly direction approximately 35 miles from Buffalo, over Niagara Falls, and into Lake Ontario. Because of the River's historical importance as a communications route, a portage to bypass the Falls and the adjacent rapids has for centuries run from about one-half mile above the Falls to present-day Lewiston, New York, approximately seven miles below (or North of) the Falls. Id. at 456; see also id. at 544 (Map Appendix A).
 
 
 10
 The lands at issue are 40-odd islands in the River between Lake Erie and Niagara Falls. Grand Island, by far the largest and most important, encompasses approximately 19,000 acres and effectively splits the River into two channels about five miles north of Lake Erie. Although originally it was thought that the boundary between the United States and Canada (then governed by Great Britain) bisected Grand Island, it was finally determined in 1822 that because the western channel was the main channel, it formed the boundary between the two countries, leaving Grand Island within the United States. Id. at 456-57; see id. at 544 (Map Appendix A).
 
 
 B. The Senecas
 
 
 11
 The Senecas were the westernmost tribe of the Six Nations, or Iroquois Confederacy, which also included the Cayugas, Onondagas, Oneidas, Mohawks, and (by the early Eighteenth century) the Tuscarooras. Joint Stip. ¶ 10. Although permanently located to the east of the Niagara region, the Senecas defeated tribes inhabiting Grand Island and the area around present-day Buffalo in the Seventeenth century, scattering them to the north and south of the Niagara region. Id. ¶¶ 18-20. The Senecas did not permanently occupy the Niagara region, but instead used it as a seasonal hunting and fishing grounds, maintaining temporary villages at permanent locations adjacent to the Lakes and the Niagara River. Other Indians also used the region as an avenue of communication and transportation. Seneca II, 206 F.Supp.2d at 458.
 
 IV. History of the Region
 
 12
 Ownership of the islands is embedded in the history of the area and requires analysis of a series of Colonial era documents. They include treaties and royal proclamations as well as contemporaneous correspondence involving Indian nations, various colonies, Great Britain and France. The relevant documents also include the Articles of Confederation, the Constitution, and treaties and legislation enacted under both.[6]
 
 
 13
 
 A. 1678 to 1759: French Control of the Niagara Region
 
 
 
 14
 Disputes over the ownership of the region and the Islands date from the Seventeenth century. The French were the first Europeans to establish a presence in the Niagara region. In 1678, La Salle built a small settlement above the Falls near present-day Lewiston, New York, in the area of an unoccupied seasonal Seneca fishing village at the mouth of the Niagara River. At that time the French also constructed two fortifications — Fort Conty in 1680, and Fort Denonville around 1687 — at the mouth of the River, but both were short-lived.
 
 
 15
 During this period friction persisted between the French and English over control of the Great Lakes region and, in particular, the Niagara River. In 1689, King William's War broke out and the Iroquois sided with the British. The war took a heavy toll on the Iroquois and the Treaty of Peace of 1701 (the "1701 Treaty") provided that they would remain neutral in any future wars between the French and the British. Around the time of the treaty, the Iroquois (including the Senecas) "surrendered[,] delivered up and forever quit claimed" a vast tract of land, including the Niagara region, to the British. See Deed from the Five Nations to the King of their Beaver Hunting Ground ("1701 Deed"), reprinted in 4 Documents Relative to the Colonial History of the State of New York 908, 909 (E.B. O'Callahan ed., 1854) [hereinafter NY Colonial Documents].[7]
 
 
 16
 The 1701 Treaty had little lasting effect on Anglo-French relations and hostilities broke out again in 1702 in Queen Anne's War. The French were able to persuade the Iroquois to remain neutral, and, over British objection, the French asserted their presence in the Niagara region. By 1720, the French had established a permanent settlement at Lewiston and by 1727 had constructed Fort Niagara at the mouth of the Niagara River. The Fort served as a base for military expeditions and as a gateway to the upper Great Lakes region. It also prevented the westward penetration of British trade and permitted the French to interrupt trade between western Indians and British posts on Lake Ontario. The period after the construction of Fort Niagara witnessed the progressive deterioration of Anglo-French relations culminating in a decade of war during the 1750s which was formally ended by the Treaty of Paris in 1763.
 
 
 17
 
 B. 1759 to 1783: British Control Over the Niagara Region
 
 
 
 1. The Royal Proclamation
 
 
 18
 During the course of the war, the British government became convinced that uniform, centralized policies governing relations with the Indians were required. In 1763 this need was addressed in a Royal Proclamation which, among other things, reserved to the Indians under Royal protection the land west of the Appalachian Mountains (including the Niagara region). Royal Proclamation of Oct. 7, 1763 [hereinafter "Royal Proclamation"], reprinted in Colonies to Nation 1763-1789: A Documentary History of the American Revolution 16, 18 (Jack P. Greene ed.1975) [hereinafter Colonies to Nation]; Joint Stip. ¶ 45; see Seneca II, 206 F.Supp.2d at 549 (Map Appendix F). The Royal Proclamation enjoined individuals from "making any purchases or settlements whatever, or taking possession of any of the lands above reserved, without our especial leave and license for that purpose first obtained." Joint Stip. ¶ 45.
 
 
 2. The 1764 Treaties of Peace
 
 
 19
 After the British assumed de facto control over the Niagara region in 1759, a faction of Senecas hostile to the British joined a tribal insurrection commonly known as Pontiac's Rebellion. The conclusion of the Rebellion was marked by two peace treaties between the Senecas and the British in 1764. Joint Stip. ¶¶ 43-44, 46. Construction of these treaties is pivotal to the claims in this litigation.
 
 
 20
 The first of these treaties, reached in April, provided that the Senecas "cede to His Maj'ty and his successor for ever, in full Right," a tract of four miles on either side of the Niagara River running from Lake Ontario in the North to approximately the falls (the "northern strip"), with the Senecas agreeing "never to obstruct the passage of [the portage], or the free use of any part of the said Tract...." Preliminary Articles of Peace, Friendship and Alliance, entered into, between the English and the Senecas, art. 3 [hereinafter April 1764 Treaty], reprinted in 7 NY Colonial Documents, supra, at 621; see Seneca II, 206 F.Supp.2d at 550 (Map Appendix G). Included in the margin alongside this provision was the following language: "Agreed to, provided the Tract be always appropriated to H.M.'s sole use...." April 1764 Treaty, art. 3, reprinted in 7 NY Colonial Documents, supra at 621; see also Joint Stip. ¶¶ 47-48. In addition, the treaty provided that the Senecas were to "be left in the quiet and peaceable possession of all their Rights not comprised in the foregoing articles, ... [and] they shall be once more admitted into the Covenant chain of friendship with the English." April 1764 Treaty, art. 9. Notably, the Senecas' cession of land to the British did not encompass the portion of the Niagara river—the "southern strip"—in which most of the islands contested in this action were situated. See Seneca II, 206 F.Supp.2d at 550 (Map Appendix G).
 
 
 21
 While the preliminary April agreement was to be finalized at a multi-tribal peace conference at Niagara in July, concerns regarding the security of the Niagara portage remained even after the April agreement. Joint Stip. ¶ 50. Perhaps in light of these concerns, the British Superintendent for the Northern Indian District, Sir William Johnson, called for an expansion of the April Treaty to include "the Lands from above your late Gift, to the Rapids at Lake Erie on both Side the Streights, in Breadth as the former, and to include all the Islands"—in other words, the southern strip including the Islands. Id. ¶ 52.
 
 
 22
 The August Treaty reflected this expansion. It provided:
 
 
 23
 [I]n addition to the grant made by the [Senecas] to His Majesty ... in April,... the [Senecas] now, surrender up all the lands from the upper end of the former Grant (and of the same breadth) to the Rapids of Lake Erie, to His Majesty, for His sole use, and that of the Garrisons, but not as private property, it being near some of their hunting grounds; so that all that Tract, of the breadth before mentioned, from Lake Ontario to Lake Erie, shall become vested in the Crown, in manner as before mentioned, excepting the Islands between the great Falls and the Rapids, which the [Senecas] bestow upon Sir Wm Johnson as a proof of their regard and of their knowledge of the trouble he has had with them from time to time.
 
 
 24
 The Treaty of Peace and Alliance ("August 1764 Treaty"), art. 5, reprinted in 7 NY Colonial Documents, supra, at 652-53 (emphasis added); see also Seneca II, 206 F.Supp.2d at 551 (Map Appendix H). Thus, while the August 1764 Treaty did indeed extend the Senecas' land cession to the Crown to include the southern strip, it also provided that William Johnson take title to the Islands. But when Johnson transmitted the Treaty to the Earl of Halifax, the Crown's representative, Johnson emphasized that he accepted the lands not personally but on behalf of the Crown:
 
 
 25
 I could not agreeable to the Custom of the Indians refuse their offer [of the islands], without giving great offence, and the great addition [that they] had made to what their Deputies had agreed to, last April, together with their other proposals induced me to accept them, that I might have it in my power, to make a humble offer of them to His Maj'ty for such uses as he may think proper, I must beg leave to entreat your Lord'p to present my most profound duty to His Maj'ty on this occasion and to assure him, that I should not presume to make this offer, but that I know these Islands will prove of importance within a little time & may be extremely useful at present.
 
 
 26
 ...
 
 
 27
 My sole motive, for accepting of the Islands, which they so earnestly pressed on me, was to have it in my power humbly to offer them to His Majesty.
 
 
 28
 Joint Stip. ¶ 54. There is no known response from the King to Johnson's communication regarding the Islands, and Johnson's will did not mention them. Id. ¶¶ 55-56.
 
 
 29
 Thus, by the August Treaty, the Senecas conveyed to the British a strip of land to be used for Royal, not private, purposes, extending four miles on each side of the Niagara River between Lakes Ontario and Erie, encompassing both the northern and southern strip. However, the Senecas insisted that the Islands would not be subject to this restriction and instead attempted to convey them personally to Johnson, who was cognizant of the Royal Proclamation's bar against unapproved private acquisitions of Indian land. At the same time, however, he was reluctant to offend the Seneca negotiators, and, consequently, he accepted the land with the intention of conveying it to the Crown.[8]
 
 
 3. The 1768 Treaty of Fort Stanwix
 
 
 30
 By the 1768 Treaty of Fort Stanwix, a formal boundary was established to replace the 1763 Proclamation Line. See Deed Determining the Boundary Line between the Whites and Indians ("1768 Treaty of Fort Stanwix"), reprinted in 8 NY Colonial Documents, supra, at 135, 136. Under this Treaty, the Indians ceded to the British all the land to the east of a line running roughly in a northeasterly direction from the juncture of the Ohio and Mississippi Rivers to Fort Stanwix (near present day Rome, New York). Id. at 136; see Seneca II, 206 F.Supp.2d at 552 (Map Appendix I). The Niagara region was to the west of this line and thus, under the Treaty, within Indian territory. In addition, the Indians appeared to condition the cession on the King's "compl[iance] with our humble requests as ... expressed in the speech of the several Nations" some two days earlier, id. at 135, which, the parties agree, was a statement during negotiations that "none of the Provinces or their people shall attempt to invade [the land west of the 1768 boundary line] under color of any old deeds, or other pretences whatsoever for in many of these things we have been imposed upon, and therefore we disclaim them all." Joint Stip. ¶ 59.
 
 
 4. The Revolutionary Period and the Articles of Confederation
 
 
 31
 Shortly after the Revolutionary War started, the Continental Congress began drafting the Articles of Confederation, which were completed and submitted to the Colonies for ratification in 1777. The Articles were drafted against the backdrop of the ongoing war with the British and hostile Indian Nations (which included the Senecas), and a major controversy between the so-called landed states—those claiming Western lands pursuant to their colonial charters or, in the case of New York, pursuant to past dealings with the Six Nations—and the so-called landless states—those without such claims. Oneida Indian Nation v. New York, 860 F.2d 1145, 1152 (2d Cir.1988) (Oneida II).
 
 
 32
 An aim of the new confederal government was to limit the territory of the landed states to their traditional borders near the East Coast and secure for itself the lands to their west. Ultimately, a compromise was reached in which the landed states ceded western lands to the United States, often in exchange for the recognition of favorable traditional boundaries to the east. Id. As part of this compromise, New York ceded claims to all lands west of a meridian drawn south from the western tip of Lake Ontario, which left the Niagara region well within New York's western boundary. Joint Stip. ¶¶ 64-65; see, e.g., Seneca II, 206 F.Supp.2d at 552 (Map Appendix I) (demonstrating that the westernmost point of Lake Ontario lies well to the west of the Niagara region).
 
 
 33
 The Articles of Confederation reflected a mistrust of centralized government. Article II, for example, provided that "[e]ach State retains its sovereignty, freedom and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled." U.S.C.A. Art. of Confed. art. II. In ceding their claims to western lands, the landed states secured two important benefits: first, the guarantee that "no State shall be deprived of territory for the benefit of the United States," id. art. IX, cl. 2; and second, the provision that in exercising its "sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the States," the United States could not "infringe[] or violate[]" the "legislative right of any State within its own limits," id. art. IX, cl. 4 (the "Legislative Rights Proviso").[9]
 
 
 34
 The 1783 Treaty of Paris concluded hostilities and set the international boundary with Canada (then governed by Britain), in part, along the "middle" of the Niagara River between Lakes Erie and Ontario. See Treaty of Paris, art. 2, 8 Stat. 80, 81 (1783). Notwithstanding the Treaty of Paris, until 1796 the British retained possession of Fort Niagara, on the United States side of the River at Lake Ontario. Joint Stip. ¶ 69. The Treaty did not specifically mention the Islands.
 
 
 35
 
 C. 1784 to 1815: United States Control over the Niagara Region
 
 
 
 1. The 1784 Treaty of Fort Stanwix
 
 
 36
 The Treaty of Paris did not address continuing hostilities with Indian nations, which proved a source of ongoing friction. See generally Seneca II, 206 F.Supp.2d at 474-76. Accordingly, Congress decided to acquire from the Iroquois land in the "Northwest Territory" (present-day Ohio), not only as a buffer but also to be able to sell to pay war debts. Joint Stip. ¶ 71. Congress empowered treaty commissioners "to confer, treat, agree and conclude with the Indians, of and concerning the establishment of peace ..., extinguishing their claims and settling boundaries between them and the citizens of the United States." Seneca II, 206 F.Supp.2d at 476 (internal quotation marks omitted). Among the lands the government sought to acquire, no mention was made of the Niagara region or the Islands.
 
 
 37
 Around the same time, but prior to the 1784 Treaty of Fort Stanwix, New York, believing that it was authorized to do so by the Legislative Rights Proviso, sought to conclude a peace treaty with the Iroquois.[10] Specifically, New York asked the Iroquois to cede the lands in the vicinity of Niagara and Oswego, but the Iroquois Nations' negotiator responded that "[t]his already belongs to [y]ou by the Treaty with Great Britain." Speech of Joseph Brant to the Mohawks, Onondagas, Cayugas, and Senecas (1787) [hereinafter Brant Speech], reprinted in Proceedings of the Commissioners of Indian Affairs 61 (Franklin B. Hough ed. 1861). Ultimately, no agreement was reached.
 
 
 38
 The 1784 Treaty of Fort Stanwix established a western boundary for Iroquois Nations land claims, reserving for the United States all lands located to the west of the boundary. See 1784 Treaty of Fort Stanwix, art. III, 7 Stat. 15, 15-16 ("[T]he Six Nations shall and do yield to the United States, all claims to the country west of the said boundary...."). In addition to securing for the United States the "Northwest Territory," the Treaty also secured the Niagara region and a "competent district around" Fort Oswego to the United States, despite the fact that the commissioners had not been instructed by Congress to acquire it. Seneca II, 206 F.Supp.2d at 479.
 
 
 39
 The area around the Niagara region purportedly secured by the Treaty was roughly coterminous with that acquired by the British in the August 1764 Treaty. See id. at 553 (Map Appendix J). Congress received and recommended approval of the Treaty, and ordered it published. It did so, however, along with language proposed by a New York delegate to the Congress, Melancton Smith, declaring that "no purchases, which have been or hereafter may be made from the Indians, at any treaties held or to be held with them, of their right to soil within the limits of any state, can, ought, or shall be considered as interfering with the right of any such state to the jurisdiction or soil." 29 Jour. Continental Cong. 806 (Oct. 4, 1785). Indeed, when the Senecas expressed concern to the New York State Commissioners of Indian Affairs in 1787 that the United States might travel through their "Country" and "disturb our Wives and Children" in traveling to the Niagara region, the New York State Senate resolved, in part, that "the Governor be requested to ... inform [the Senecas] that the land ceded at the treaty of Fort [Stanwix] in 1784, to the United States, (except those they mention in the vicinity of Oswego and Niagara) are not deemed to be comprehended within the jurisdiction of this State." J. of the Sen. of the State of N.Y. 75, 80 (1787) (emphasis added).
 
 
 2. The 1786 Hartford Compact
 
 
 40
 Although the Continental Congress accepted New York's cession of western land claims in 1782 and acknowledged its western border, a dispute remained between Massachusetts and New York as to their competing claims (and rights of preemption over Indian lands) within that border.[11] See Joint Stip. ¶¶ 79-82. The 1786 Hartford Compact settled this dispute, granting Massachusetts the right of preemption, in relevant part, over Indian lands located more than one mile to the east of the Niagara River, while New York retained both sovereignty and the right of preemption over the lands to the west of that boundary, including the River and the Islands.[12] Id. ¶¶ 81-82; see Seneca II, 206 F.Supp.2d at 554 (Map Appendix K).
 
 
 3. The Constitution and the Non-Intercourse Act
 
 
 41
 The new Constitution did away with the Legislative Rights Proviso in the Articles of Confederation, at least with respect to Indian relations, and, through the Indian Commerce Clause, gave the federal government sole power over Indian affairs. See U.S. Const. art. I, § 8, cl. 3. Congress soon passed the Non-Intercourse Act, which, in its 1802 iteration, barred conveyances of Indian land without Congressional approval. See supra note 3.
 
 
 4. The 1794 Treaty of Canandaigua
 
 
 42
 The Senecas were dissatisfied with the boundary drawn in 1784 at Fort Stanwix.[13] Also, hostilities between the United States and the western (non-Iroquois) Indians continued intermittently after the Revolutionary War, complicating the United States' expansion westward into the territories acquired in the 1784 Treaty. By 1793, Secretary of War Henry Knox proposed, as a means of securing peace, to permit treaty commissioners to cede land acquired in 1784—a proposal which President Washington's cabinet concluded to be permissible "provided that no grants to individuals nor reservations to states be thereby infringed." 25 Papers of Thomas Jefferson 258-59 (John Catanzariti ed.1992). No agreement was reached, and the military struggle with the western Indians continued.
 
 
 43
 In 1794, as a consequence of concerns that the Senecas might join ranks with the hostile western Indians, the United States once again sought a permanent peace with the Iroquois Nations. See Seneca II, 206 F.Supp.2d at 486. Initially, the Senecas pressed the United States to relinquish its land along the Niagara River. Id. at 488. The United States' negotiator, Timothy Pickering, replied that he would "freely give [the land] up" if the United States were permitted to "cut[] a road ... [with] taverns to accommodate travellers," but the Senecas rejected this compromise, as well as one that would have permitted the United States to retain "three or four mile-square tracts on the river bank to be used as `convenient stages' in return for $500 annually." Id.
 
 
 44
 Ultimately, the land that the United States "acknowledge[d] ... to be the property of the Seneka nation" under the Treaty of Canandaigua encompassed a substantial part of what is now western New York, including the southern Niagara strip. Treaty of Canandaigua, Nov. 11, 1794, art. III, 7 Stat. 44; Joint Stip. ¶ 91. Specifically, the Senecas' western boundary under the Treaty ran "along the river Niagara to Lake Erie," but the Treaty did not mention the River's islands. Treaty of Canandaigua, art. III, 7 Stat. at 44; see Seneca II, 206 F.Supp.2d at 555-56 (Map Appendices L and M). Whether the phrase "along the river" includes the Islands is the critical issue in this litigation. See infra Part VI.B.1.
 
 
 5. Post-Canandaigua Developments
 
 
 45
 As relations between the United States and Great Britain deteriorated in the early years of the Nineteenth Century, ownership of the Islands took on renewed strategic importance. See Seneca II, 206 F.Supp.2d at 495-96. In 1811, the New York legislature authorized Governor Daniel Tompkins to purchase the Islands from the Senecas. Joint Stip. ¶ 105. Governor Tompkins, however, was not sure that such a purchase was legally necessary. In an 1812 letter to Thomas Gosvenor, Chairman of New York's Committee on Indian Affairs, he recounted a conversation with certain Seneca Chiefs, who were then reluctant to sell the Islands to New York. He emphasized to them the questionable nature and the "slenderness of their title" under the 1794 Treaty of Canandaigua, by which "the lands which they [were] reserved were specifically described by metes and bounds, which metes and bounds excluded the ... Islands." Id. ¶ 106. Tompkins was clearly referring to the reservation of land "along" the southern strip of the Niagara River as expressly excluding any islands located within the river. See 1794 Treaty of Canandaigua, art. 3, 7 Stat. at 43. He further explained that the Islands belonged to New York because they were given by the Iroquois Nations to Sir William Johnson in the August 1764 Cession, and that if he "ever had a valid title for those Islands" they would have passed to his son, Sir John Johnson, upon his death, and finally to "the people of this State" upon John Johnson's "attainder." Id. Any negotiated purchase, he had advised the Senecas, would be a manifestation of the State's "friendship and liberality towards" the Senecas, but was not required by law. Id. Tompkins believed that the Senecas' reluctance to "sell" the Islands was on account of "the precarious State of our relations with [British] Canada," and that they sought to "defer any negotiation relative to the sale of the Islands... to some period at which a treaty might be held by them on that subject without exciting the jealously [sic] and suspicion of the Canadian government." Id.
 
 
 46
 The Senecas remained neutral at the outset of the War of 1812, but when rumors of a British invasion of Grand Island—which the Senecas believed to be theirs—circulated, they allied themselves with the United States. Red Jacket, a Seneca Chief, explained their decision to Erastus Granger, the United States Indian agent for the Iroquois Nations, accordingly: Our property is taken possession of by the British and their Indian friends. It is necessary for us now to take up the business, defend our property and drive the enemy from it. If we sit still upon our seats ..., the British (according to the customs of you, white people) would hold it by conquest—and should you conquer the Canadas, you will claim it upon the same principles, as conquered from the British.
 
 
 47
 Buffalo Gazette, Aug. 4, 1812, quoted in Seneca II, 206 F.Supp.2d at 497.
 
 
 48
 The 1814 Treaty of Ghent, which concluded the War of 1812, established a Commission to determine the international boundary in the Niagara River basin as previously set forth in the 1783 Treaty of Paris.[14] Shortly thereafter, New York resumed its attempts to "purchase" the Islands from the Senecas, with Governor Tompkins still contending that "[a]lthough it is questionable whether these Indians have any title to the lands, ... I am willing (with a view to avoid any collisions, and to perpetuate the good understanding which at present exists between them & the government) to pay ... for the relinquishment of their right to all the Islands." Seneca II, 206 F.Supp.2d at 497-98. On September 12, 1815, the purchase was consummated. The Senecas agreed to "sell, grant, convey, and confirm to the people of New York, all the islands in the Niagara River between Lake Erie and Lake Ontario within the jurisdiction of the United States" in exchange for $1,000 and a perpetual annuity of $500. Joint Stip. ¶ 108. It is undisputed that there was no federal commissioner present, and that if the Islands were the Senecas' to convey, the conveyance would have violated the Non-Intercourse Act. Id. ¶ 109. After the international boundary was settled in 1822, and the Islands confirmed to lie within the United States, New York authorized the partition of Grand Island into lots, which were sold at auction in 1825.
 
 V. Preliminary Legal Issues
 
 A. Standard of Review
 
 
 49
 This Court reviews a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party. Elec. Inspectors, Inc. v. Vill. of East Hills, 320 F.3d 110, 117 (2d Cir.2003).
 
 
 B. Plaintiffs' Non-Intercourse Act Claim
 
 
 50
 In order to establish a violation of the Non-Intercourse Act, the Senecas are required to establish that: (1) they are an Indian tribe; (2) the land at issue was tribal land at the time of the conveyance; (3) the United States never approved the conveyance, and (4) the trust relationship between the United States and the tribe has not been terminated. See Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 56 (2d Cir.1994). Here, only the second requirement is in dispute.
 
 
 51
 The Senecas contend that the 1794 Treaty of Canandaigua conferred them "recognized title"[15] to the Islands, and, therefore, the 1815 Purchase was subject to the Non-Intercourse Act. Alternatively, they argue that the Act applied because they held aboriginal title in 1815. New York denies that the Senecas held aboriginal title to the Islands. As a consequence, New York inherited title to the Islands from the British. Further, New York maintains that even if the Senecas held aboriginal title at some point, it was extinguished prior to the Treaty of Canandaigua by either of two events—the 1764 treaties between Great Britain and the Senecas, or the 1784 Treaty of Fort Stanwix. Either transaction would have resulted in title vesting in the State of New York, and the Treaty of Canandaigua did not divest the state of that title. Thus, the argument goes, the 1815 Purchase did not violate the Non-Intercourse Act because no land was, in fact, purchased from the Senecas since New York already owned it.
 
 
 C. Canons of Indian Treaty Interpretation
 
 
 52
 Generally, treaties are construed more liberally than private agreements and the history, negotiations, and practical construction adopted by the parties are all relevant to treaty interpretation. Moreover, Indian treaties "are to be construed, so far as possible, in the sense in which the Indians understood them." Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943); see also Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). In particular, they should be construed "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Oneida I, 470 U.S. at 247, 105 S.Ct. 1245.
 
 
 53
 An important qualification to these rules of interpretation exists. Specifically, "the rule of generous construction [of Indian treaties] has not been applied to divest a state of land it has acquired," where the intention to divest is not "shown in the treaty with such certainty as to put it beyond reasonable question." Oneida II, 860 F.2d at 1163-64 (quoting United States v. Minnesota, 270 U.S. 181, 209, 46 S.Ct. 298, 70 L.Ed. 539 (1926)).
 
 VI. Discussion
 
 54
 
 A. New York Held Title to the Islands Prior to the 1794 Treaty of Canandaigua
 
 
 
 55
 Since the principal dispute in this case centers on whether New York "purchased" land from the Senecas in 1815 to which it already held title, we begin our analysis with the instruments by which New York claims to have secured title: the 1764 Treaties and the 1784 Treaty of Fort Stanwix.[16] We hold that the August 1764 Treaty extinguished Seneca title to the Islands, and that, on the defeat of the British after the Revolutionary War, title passed to New York. We also hold that the 1784 Treaty of Fort Stanwix did not impair New York's title.
 
 
 1. The August 1764 Treaty Extinguished Seneca Aboriginal Title to the Islands.
 
 
 56
 The District Court held that the 1764 Treaties extinguished Seneca title because the language used (e.g., "cede", "grant", "for ever, in full Right", "surrender up", "vested in the Crown") reflected a clear intention on the part of the Crown to extinguish any title the Senecas may have possessed. The Court also concluded that this interpretation was supported by the purposes of the treaties, which were to secure the Niagara portage and to punish the Senecas for their participation in Pontiac's Rebellion. See Seneca II, 206 F.Supp.2d at 509-11. Further, the Court concluded that the August 1764 Treaty's disposition of the Islands to Sir William Johnson did not violate the 1763 Royal Proclamation, and that the cessions were not revoked by the 1768 Treaty of Fort Stanwix. Id. at 511-14. While we are not required to analyze definitively the District Court's conclusion with respect to all the land purportedly ceded in the 1764 Treaties, we hold that in the August 1764 Treaty the Senecas ceded any possessory rights to the Islands they might have held.
 
 
 57
 
 a. The Language and Purpose of the August 1764 Treaty Evince an Unambiguous Intent to Extinguish Seneca Title to the Islands.
 
 
 
 58
 It is well-settled that an intention to authorize the extinguishment of Indian title must be "plain and unambiguous," either "expressed on the face of the [instrument] or ... clear from the surrounding circumstances." Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 276, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (quoting United States ex rel. Hualpai Indians v. Santa Fe Pac. R.R. Co., 314 U.S. 339, 346, 62 S.Ct. 248, 86 L.Ed. 260 (1941)); Mattz v. Arnett, 412 U.S. 481, 505, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973).[17] The District Court concluded that the 1764 Treaties, on their face, "manifest[] a plain and unambiguous intent on the part of the British Crown to extinguish any title the Senecas may have had to the northern and southern Niagara strips and the Niagara Islands." Seneca II, 206 F.Supp.2d at 509. This conclusion is correct. The April 1764 Treaty provided that the Senecas "cede to His Maj'ty ... for ever, in full Right," the northern strip, with the proviso that the tract be "always appropriated to [His Majesty's] sole use," April 1764 Treaty, art. 3, reprinted in 7 NY Colonial Documents, supra, at 621, and the August 1764 Treaty contained similar language providing for the Senecas to
 
 
 59
 surrender up [the southern strip] to His majesty, for His sole use, and that of the Garrisons, but not as private property, it being near some of [the Senecas' hunting grounds]; so that all of the tract, of the breadth before mentioned, from Lake Ontario to Lake Erie, shall become vested in the Crown, in manner as before mentioned, excepting the Islands between the great Falls and [Lake Erie], which the [Senecas] bestow upon Sir Wm. Johnson as proof of their regard and of their knowledge of the trouble he has had with them from time to time.
 
 
 60
 August 1764 Treaty, art. 5, reprinted in 7 NY Colonial Documents, supra, at 652-53. While the language of cession found in these documents is unambiguous, the circumstances surrounding the negotiation of these instruments are more complicated.
 
 
 61
 The Senecas argue that the 1764 Treaties did not extinguish their aboriginal title but, given the history of Anglo-French rivalry in the region, simply confirmed Britain's dominion over the land and granted it certain rights of use, but otherwise left the Senecas' possessory rights intact. For support, they cite other provisions in the 1764 Treaties, as well as the 1701 and 1726 agreements with the British which, they argue, use similar language of cession without extinguishing aboriginal title. Article 9 of the April 1764 Treaty provided that the Senecas "shall be left in the quiet and peaceable possession of all their Rights not comprised in the foregoing articles," April 1764 Treaty, art. 9, reprinted in 7 NY Colonial Documents, supra, at 623. The use of the word "Rights" as opposed to "land," the argument goes, indicates that the Senecas, in fact, retained rights in land purportedly ceded. In addition, the limitation in both treaties that the land be used "not as private property" was necessary to their retention of possessory rights. Finally, the Senecas' promise not "to obstruct the passage of the [portage], or the free use of any part of the" land in question, id. art. 3, reprinted in 7 NY Colonial Documents, supra, at 621, would not have been necessary had a cession of all of the Senecas' rights occurred.[18] In addition to these textual arguments, the Senecas contend that the language in the 1764 Treaties by which they purportedly ceded the land, if read along with the 1701 and 1726 deeds (which use similar language of cession),[19] is, in fact, ambiguous.
 
 
 62
 However, even were we to read the 1764 Treaties in this historical light, the separate disposition of the Islands to Johnson in Article 5 of the August 1764 Treaty convinces us that they were intended to be treated differently than the rest of the land "ceded" by that instrument. Article 5, as noted, provided that the Senecas "surrender up" the northern and southern strips to Great Britain, "for His [Majesty's] sole use, ... but not as private property, it being near some of [the Senecas'] hunting grounds; so that all of the Tract, of the breadth before mentioned, from Lake Ontario to Lake Erie, shall become vested in the Crown, in manner as before mentioned, excepting the Islands between the great Falls and [Lake Erie], which the [Senecas] bestow upon Sir Wm. Johnson." August 1764 Treaty, art. 5, reprinted in 7 NY Colonial Documents, supra, at 652-53. Whether the Islands "vested in the Crown" or whether Johnson actually took title (rather than just possession) by the terms of this provision, we find that the expressed intention of the parties to exclude the Islands from the Treaties' general restriction against the private use of the "ceded" lands effectively undermines—at least with respect to the Islands—the Senecas' arguments that the Treaties sought to preserve their possessory rights in these territories. The textual arguments—that extinguishment was inconsistent with additional Treaty requirements that the Senecas not obstruct the portage or interfere with the Crown's "free use" of the land—have no bearing on the Islands, which were reserved for the private use of Johnson. Furthermore, the concerns underlying the restriction on the remainder of the land's use as private property—that the land was near Seneca hunting grounds, and that its private use might generate hostilities between settlers and natives—were, evidently, not present with respect to the Islands.
 
 
 63
 Moreover, the Senecas themselves concede that "Indian title is the right to exclusive use of territory, [and is] necessarily inconsistent with private use of the territory." Seneca Rep. Br. at 18. They do not explain why the transfer of the Islands to Johnson for his personal use in the August 1764 Treaty did not, therefore, extinguish their possessory title to the land, other than arguing that the transfer itself was void on account of the 1763 Royal Proclamation (which we explore below). Therefore, we conclude that, regardless of the effect of the 1764 Treaties on the lands reserved for the use of the Crown (a matter on which we need express no opinion), the grant of possessory rights in, if not title to, the Islands to Johnson, if valid, extinguished the Senecas' own possessory rights in that property. We now explore the validity of that grant under the 1763 Royal Proclamation.
 
 
 64
 
 b. The 1764 Treaties' Disposition of the Islands to Sir William Johnson Did Not Violate the 1763 Royal Proclamation
 
 
 
 65
 Whether the August 1764 Treaty bestowed title or mere possessory rights to the Islands to Johnson, we find that the transaction did not violate the 1763 Royal Proclamation. The Proclamation was issued by the Crown in recognition of "the need to devise plans for a comprehensive, centralized Indian policy," and "forbade the purchase or settlement of Indian lands west of the crest of the Appalachian Mountains by anyone ... without permission of the Crown." Royal Proclamation (Oct. 7, 1763), reprinted in Colonies to Nation, supra, at 16-18. The District Court held that the transaction did not violate the Proclamation because, by the terms of Article 5 of the August 1764 Treaty, the Islands were ceded to the Crown, not to Sir William Johnson, and that, even if they were ceded to Johnson, his acceptance of the Islands on behalf of the Crown cured any putative violation of the Proclamation. Seneca II, 206 F.Supp.2d at 512.
 
 
 66
 Without definitively addressing the District Court's literal construction of Article 5, we agree with its alternative conclusion that Johnson effectively accepted the land on behalf of the Crown and that he could not and, in fact, did not accept the land on his own behalf. Johnson repeatedly confirmed this interpretation in contemporaneous correspondence. In August 1764 he wrote to the Lords of Trade that "[my] sole motive, for accepting of the Isleands [sic], which they so earnestly pressed on me, was to have it in my power humbly to offer them to His Majesty." Letter from Sir William Johnson to the Lords of Trade (Aug. 30, 1764), reprinted in 7 NY Colonial Documents, supra, at 648, 649 (transmitting the 1764 Treaties for Royal approval). The same month he wrote to the Earl of Halifax that "I could not agreeable to the Custom of Indians refuse their offer, without giving great offence, and the great addition themselves had made to what their Deputies had agreed to, last April, together with their other proposals induced me to accept of them, that I might have it in my power, to make an humble offer of them to His Maj'ty for such uses as he may think proper." Letter from Sir William Johnson to the Earl of Halifax (Aug. 30, 1764), reprinted in 7 id. at 647. Again, he wrote to John Vaughan that "I judged [that the Islands] might prove of more use to the government, and accordingly made a Tender of the Whole to his Majesty in my letter to London at that time...." Letter from Sir William Johnson to John Vaughan (Aug. 15, 1765), reprinted in 11 Johnson Papers, supra, at 894-95. Finally, Johnson consistently counseled others that they could not accept any of the Islands, if offered one, because the Islands were the Crown's to dispose of as it saw fit. 11 id. at 895. Since the record provides no indication that the Crown disapproved of any aspect of the Treaties, we conclude that the Crown accepted Johnson's conveyance of the Islands he received from the Senecas. Viewing this transaction practically, we are convinced that Johnson, as the Crown's agent, accepted the Islands from the Senecas on behalf of the Crown. For these reasons, we conclude, as did the District Court, that the transaction did not violate the Royal Proclamation.
 
 
 2. The 1768 Treaty of Fort Stanwix Did Not Revoke the 1764 Cession of the Islands
 
 
 67
 After concluding that the 1764 Treaties extinguished the Senecas' title to the land in the Niagara region, the District Court then held that these land grants were not revoked by the 1768 Treaty of Fort Stanwix. See Seneca II, 206 F.Supp.2d at 514-15. Limiting our consideration to the Islands, we agree that the Treaty did not revoke the Senecas' cession of them. The Treaty established a "Boundary Line" in order to "prevent those intrusions & encroachments of which [the Senecas] had so long and loudly complained and to put a stop to the many fraudulent advantages which had been so often taken of [the Senecas] in Land affairs." 1768 Treaty of Fort Stanwix, reprinted in 8 NY Colonial Documents, supra, at 135. The boundary left the Niagara region in Seneca territory, and the Treaty provided (by reference) that "none of the Provinces or their People shall attempt to invade [the land west of the Boundary Line] under color of any old Deeds, or other pretences what soever for in many of these things we have been imposed on, and therefore we disclaim them all." Speech of the Senecas of Nov. 1, 1768 [hereinafter 1768 Conditions], reprinted in 8 NY Colonial Documents, supra, at 127.[20] The parties dispute whether the "Provinces or their People" includes the Crown. If it does, the clause would deny the Crown the right to "invade" the lands west of the Boundary Line under "any old Deeds," including, presumably, any land cessions by the Senecas pursuant to the 1764 Treaties.
 
 
 68
 We agree with the District Court that the 1768 Treaty did not revoke the grants in the 1764 Treaties. First, the text of the Treaty strongly indicates that the "Provinces or their People" was not intended to include the Crown. The 1768 Treaty distinguishes between the Crown and the Provinces, providing that the Iroquois Nations
 
 
 69
 Grant ... unto our said Sovereign Lord King George the third, All that Tract of Land situate in North America at the Back of the British Settlements bounded by a Line ... and extending Eastward from every part of the said Line as far as the Lands formerly purchased so as to comprehend the whole of the Lands between said Line and the purchased Lands or settlements, except what is within the Province of Pensilvania [sic].
 
 
 70
 1768 Treaty of Fort Stanwix, reprinted in 8 NY Colonial Documents, supra, at 136. The Indians, therefore, granted land to the Crown that was located between the boundary line and pre-existing settlements, and expressly excluded from the grant land that was already located within the "Province" of Pennsylvania.
 
 
 71
 Second, the District Court properly concluded that the Crown never intended to relinquish its holdings to the west of the Boundary Line. See Seneca II, 206 F.Supp.2d at 514. Johnson was specifically instructed that certain British posts to the west—including Niagara—were to be maintained, and Niagara remained an important British outpost for many years following the 1768 Treaty. See generally Def. Ex. 75.
 
 
 72
 Finally, the Iroquois Nations' concern over the "old Deeds" they sought to disclaim was over fraudulent transactions, "intrusions [and] encroachments," and similar unfair dealings. We see nothing in the record to suggest that the Iroquois Nations included the 1764 Treaties among those transactions they considered unfair. See also id. Indeed, the fact that the Senecas referred to the 1764 Treaties in subsequent communications with the nascent United States government is an additional indication that they did not intend British rights to be relinquished under the 1768 Treaty. See, e.g., Brant Speech, reprinted in Proceedings of the Commissioners of Indian Affairs, supra, at 61 ("You have particularly expressed your Wish to have Lands at Niagara and Oswego.... We have formerly ceded some Lands to the Government of the late Colony of New York for the Use of the King. This already belongs to You...."); The Speech of the Cornplanter, Half-Town, and the Great-Tree, Chiefs and Councillors of the Seneca nation, to the Great Councillor of the Thirteen Fires (Dec. 1, 1790), reprinted in 4 American State Papers 140, 141 (1792) ("To [William Johnson] we gave four miles round Niagara as a place of trade."). Thus, we agree with the District Court that the 1768 Treaty did not rescind or otherwise modify the cessions that took place in 1764.
 
 
 73
 
 3. The 1784 Treaty of Fort Stanwix Did Not Divest New York of the Title to the Islands that it Inherited From the British After the Revolution.
 
 
 
 74
 Since we hold that the 1764 Treaties extinguished Seneca title to the Islands, we need not reach the question whether the 1784 Treaty of Fort Stanwix between the United States and the Iroquois Nations accomplished the same result. What we must determine, however, is whether the title secured by the Crown passed to New York after the Revolution, and whether, by the 1784 Treaty of Fort Stanwix, the United States appropriated the title for itself.
 
 
 a. British Title to the Islands Passed to New York After the Revolution.
 
 
 75
 We are persuaded that British title to the Islands passed to New York after the Revolution, and that New York's western boundary vis-a-vis the United States was established by 1782. As an initial matter, it is well-established that, prior to the Revolution, "[t]he rights of property and dominion in the lands discovered by those acting under royal authority were held to vest in the Crown," and that "[a]s a result of the Revolution, the people of each State became sovereign and in that capacity acquired the rights of the Crown." Massachusetts v. New York, 271 U.S. 65, 85-86, 46 S.Ct. 357, 70 L.Ed. 838 (1926); see Shively v. Bowlby, 152 U.S. 1, 14-15, 14 S.Ct. 548, 38 L.Ed. 331 (1894) ("[U]pon the American Revolution, all the rights of the Crown and of Parliament vested in the several States, subject to the rights surrendered to the national government by the Constitution of the United States."). It is similarly clear that New York, prior to the Revolution, was seen as having jurisdiction over the lands controlled by the Iroquois Nations, including the Niagara region, as a result of a covenant relationship by which the Iroquois "surrender'd [their territory] to the Crown to be protected and defended for them." Report of Governor Tryon on the Province of New York (June 11, 1774) [hereinafter Tryon Report], reprinted in 8 NY Colonial Documents, supra, at 434, 436-37 (discussing the extent of the boundaries of the Province of New York).[21] The question presented, given our resolution of the extinguishment issue, is whether New York's fee title to the Islands (obtained from the Crown) survived the land disputes framing the adoption of the Articles of Confederation, and later ones involving New York and Massachusetts. We hold that it did.
 
 
 76
 New York's western boundaries with Massachusetts were not formally settled until the 1786 Hartford Compact. By virtue of its 1782 cession of western land claims to the Confederal government, by 1782 New York possessed rights to all lands in the Niagara region previously held by the Crown. As explained above, disputes between the "landed states," whose charters extended from sea to sea, and the "landless states," with no such claims, were a major impediment to the ratification of the Articles of Confederation. See Oneida II, 860 F.2d at 1152. To address this problem, the new government undertook to secure western territories from the landed states in exchange for favorable treatment regarding important, and often equally contentious, traditional eastern boundaries.
 
 
 77
 New York faced two significant problems. The first was secessionist pressure on its eastern boundary from Vermont. The second was Massachusetts' (charter-based) attack on its western claims. New York sought compromise by offering to cede some of its westernmost claims in exchange for favorable congressional treatment of its troublesome Vermont problem.[22] The New York Act of Cession was submitted to the Continental Congress, and was ultimately accepted in 1782, though without the eastern territorial guarantees sought by New York. See 23 J. Cont. Cong. 694 (Oct. 29, 1782) (accepting New York's cession as submitted before the Continental Congress in 1781). By the cession, New York agreed to a western boundary line that included the Niagara region, thereby retaining jurisdiction over—and title to—the Islands. See 19 J. Cont. Cong. 212 (Mar. 1, 1781).
 
 
 78
 The Senecas claim that acceptance of the cession in 1782 involved neither congressional recognition of New York's remaining territorial claims nor an end to territorial challenges by rival states. Even accepting this argument, however, congressional refusal to guarantee states' borders upon their cession of western land claims during this period did not, we believe, indicate that New York's territory remained subject to acquisition by the United States government. The fact that New York's western boundaries were not settled until its dispute with Massachusetts over land claims was resolved in 1786 did not mean that the United States, in contravention of the 1782 Cession, could take possession of the disputed New York territory. We agree that "based on abundant contemporaneous documentation and maps," New York's western boundary was fixed by 1782. Oneida II, 860 F.2d at 1167. Consequently, in 1782, New York owned the Islands.
 
 
 b. The United States Did Not Divest New York of its Title to the Islands by the 1784 Treaty of Fort Stanwix
 
 
 79
 We next consider whether the 1784 Treaty somehow impaired New York's title to the Islands. We conclude that it did not. Although the United States reached peace with Great Britain by the 1783 Treaty of Paris, peace was not achieved with Britain's Iroquois allies until the 1784 Treaty of Fort Stanwix. In authorizing the commissioners to negotiate the Treaty with the Iroquois Nations, Congress explained that while "the hostile tribes of Indians in the northern and middle departments [were] seriously disposed to a pacification,... they [were] not in a temper to relinquish their territorial claims, without further struggles." 25 J. Cont. Cong. 680, 681 (Oct. 15, 1783). These territorial claims were important for a number of reasons. The colonial army had promised its soldiers western lands as bounties for military service, but there were insufficient public funds with which to purchase land. A population increase coupled with foreign immigrations required the government "to make speedy provision for extending the settlement of the territories of the United States." Id. at 682-83. Finally, the new nation's public creditors looked to the proceeds of land sales for satisfaction of their debts. Id. In sum, the new government needed land and money. Because hostile Indian tribes had been "aggressors in the war, without even a pretence of provocation," Congress concluded that "atonement" was in order, and that the Iroquois Nations "possess[ed] no other means to do this act of justice than by a compliance with the proposed boundaries." Id. at 683.
 
 
 80
 Still, Congress was careful to respect the rights of the states. The proposed boundaries "between the United States and the several tribes of Indians who shall be affected thereby" were drawn around a region to the west of Pennsylvania and to the north of the Ohio River, impinging (after the various cessions earlier in the decade) on no state's land rights. Id. at 686. If this were not enough, Congress specifically resolved that this authorization was not to be "construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits." Id. at 693. Ultimately, of course, the Treaty went beyond the lands authorized by Congress, with the Iroquois Nations "yield[ing]" land claims encompassing the Niagara region as well as other portions of western New York. 1784 Treaty of Fort Stanwix, art. 3, 7 Stat. at 15; see Seneca II, 206 F.Supp.2d at 553 (Map Appendix J). However, in accepting the transmission of the Treaty and ordering it published, Congress adopted language offered by a delegate from New York declaring that "no purchases, which have been or hereafter may be made from the Indians, at any treaties held or to be held with them, of their right to soil within the limits of any state, can, ought, or shall be considered as interfering with the right of any such state to the jurisdiction or soil." 28 J. Cont. Cong, 426, quoted in Oneida II, 860 F.2d at 1165 (emphasis in original).
 
 
 81
 It is against this background, as well as the Articles of Confederation, that we construe the 1784 Treaty of Fort Stanwix. At the outset, however, we note that regardless of whether the confederal government had the power to appropriate state land for its own benefit in this manner, the text of the Treaty is consistent with New York's retention of title to the Islands. Although the Islands are ostensibly encompassed in the Treaty's boundary call, the Iroquois merely "yield[ed]" to the United States what rights they may have had to them. 1784 Treaty of Fort Stanwix, art. 3, 7 Stat. at 15. Since we hold that, as of 1764, the Senecas had ceded all their rights in the Islands, they could not have been conveyed by the terms of the 1784 treaty because they simply were no longer the Senecas' to convey.
 
 
 82
 Even if it were possible to construe the text of the 1784 Treaty as vesting title to the Islands in the United States, we believe the Articles of Confederation bar this interpretation. Under the Articles, the confederal government had the "sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated." U.S.C.A. Art. of Confed. art. IX(4) (emphasis added).[23] Even more clearly, Article IX(2) provides that "no state shall be deprived of territory for the benefit of the United States." U.S.C.A. Art. of Confed. art. IX(2). It is clear that this provision was an express prohibition against the confederal government taking state land for its own purposes, and consequently if New York already held fee title to the Islands in 1784, any taking of that land by the United States for its own benefit would have violated the Articles of Confederation.[24] For these reasons, we conclude that the 1784 Treaty of Fort Stanwix did not divest New York of title to the Islands.
 
 
 c. The Supremacy Clause of the Constitution did not Retroactively Vest Title to the Islands in the United States
 
 
 83
 The Senecas argue that even if the United States' purported acquisition of the Islands in the 1784 Treaty of Fort Stanwix was invalid under the Articles of Confederation, the ratification of the new Constitution containing the Supremacy Clause, which rendered "all treaties made" under the Articles of Confederation the supreme law of the land, U.S. Const. Art. VI, cl. 2, implicitly validated the Treaty, mooted any inconsistency with the Articles, and made the Treaty the law of the land. We are not persuaded. The issue is not whether the treaty was valid; we assume its validity. Our task is to assess its meaning and legal consequences—in other words, to view it through the lens of the Articles of Confederation, the authority under which the confederal government was acting at that time. As we indicated above, we believe the legal and political context surrounding the 1784 Treaty of Fort Stanwix demonstrates that New York's title to the Islands was undisturbed by that instrument. Accordingly, we are not presented with the question of whether the Constitution's "treaties made" provision operated to cure a potentially defective acquisition by the United States of New York land under an earlier treaty.
 
 
 84
 
 B. The 1794 Treaty of Canandaigua Did Not Divest New York of Title to the Islands.
 
 
 
 85
 This brings us to the 1794 Treaty of Canandaigua, in which the Senecas, dissatisfied with (what they believed to be) their land cessions in the 1784 Treaty, purported to secure from the United States, among other things, the southern Niagara strip (which, if interpreted to extend to the middle of the navigable waterway, would include the Islands). The pertinent text of the treaty provides: "The land of the Seneka nation is bounded as follows: ... the line runs along the river Niagara to Lake Erie.... Now, the United States acknowledges all the land within the aforementioned boundaries, to be the property of the Seneka nation...." 1794 Treaty of Canandaigua, art. 3, 7 Stat. at 45 (emphasis added); see Seneca II, 206 F.Supp.2d at 555-56 (Map Appendices L and M).
 
 
 86
 The District Court held that the 1794 Treaty did not divest New York of its fee title to the Islands and return them to the Senecas. Seneca II, 206 F.Supp.2d at 528-29. It based its decision on two alternative findings: first, that the language "along the river Niagara" should not be read to include the Islands in the river; and second, that even if the Islands were included in the grant and the United States had the power to convey state land, the cession to the Senecas of New York land was a taking for which just compensation was not paid, and thus title was never transferred. We agree with the first of these conclusions, and do not reach the second.
 
 1. "Along the river Niagara" is Ambiguous
 
 87
 The District Court held that the boundary call "along the river" was susceptible of two interpretations. In light of this ambiguity, it held that the rule in United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926), applied. That rule prohibits construction of a treaty that would divest a state of land unless the intention to do so was certain "beyond reasonable question." Id. at 209, 46 S.Ct. 298. We think that the rule was properly invoked, and are not persuaded—certainly not "beyond reasonable question" that the boundary call "along the river" can only be read to include the Islands.
 
 
 88
 We agree with the Senecas that a treaty must be construed "in light of the common notions of the day and the assumption of those who drafted [it]," Wilson v. Omaha Indian Tribe, 442 U.S. 653, 666, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), and we assume that the interpretation of boundary calls, such as "along the river," is informed by the common law. Under the common law, the ownership of a river's bed, including any islands located within the river, depended on whether the river was "navigable." See, e.g., The King v. Smith, 99 Eng. Rep. 283, 285 (K.B. June 13, 1780) (1909 ed.) (Buller, J.) ("prima facie, the soil of a navigable river belongs to the King"). Thus, a grant by the sovereign of land "along" a "navigable" river would, prima facie, extend to the water's edge, but ownership of the river bed and any islands located in the river would remain in the sovereign. The legal definition of "navigable," however, was the subject of considerable confusion.
 
 
 89
 The term "navigability" referred either to whether the river was affected by tides (a "royal river"), or the river was actually navigable (a "public highway").[25] Consequently, the parties dispute whether the beds to freshwater rivers that were actually navigable, such as the Niagara River, were presumptively held by adjoining landowners or were held by the sovereign. If title to the beds was held by landowners, then the boundary call "along the river" would include the Islands. If title was held by the sovereign, then the grant to the Senecas would stop at the river bank.
 
 
 90
 This was a complicated question under the common law. The Senecas cite Lord Chief Justice Hale's influential treatise on water rights, De Jure Maris et Brachiorum ejusdem, reprinted in 1 A Collection of Tracts Relative to the Law of England from Manuscripts 1 (1667) (Francis Hargrave ed. 1787), for the proposition that the soil under public, non-tidal rivers was owned by the adjoining landowners. But Hale's view has been the subject of considerable controversy. See Glenn J. MacGrady, The Navigability Concept in the Civil and Common Law: Historical Development, Current Importance, and Some Doctrines that Don't Hold Water, 3 Fla. St. L.Rev. 513, 584 (1974) ("One might be tempted to conclude that by the time of De Jure Maris (1667), the common law recognized that Crown ownership of riverbeds was to be tested by a tidality criterion," but "the descriptive rhetoric in subsequent English submerged bed cases does not adhere to a tidality criterion...."); Louis Houck, A Treatise on the Law of Navigable Rivers 10-25, 25 (1868) (describing as "well-founded" the statement that "it is not free from doubt, whether the land covered by non-tidal rivers, which are navigable... does not by Common Law belong to the crown"); see also John M. Gould, A Treatise on the Law of Waters §§ 49, 50, at 115, 116-17 (2d ed. 1891) (describing Hale's work, on the issue of soil ownership of riverbeds, as actually "support[ing] the doctrine that the public have no rights in any fresh-water river except that of navigation," and noting that the English cases from this period supply "no certain rule" because they "relate either to tidal rivers or to fresh rivers which do not appear to be navigable [in fact]"). In sum, there was considerable confusion at the time as to "navigability" and no clear common law rule as to riverbed ownership.[26] We therefore agree with the District Court's conclusion that the phrase "along the river" is ambiguous.
 
 
 91
 
 2. Minnesota v. United States Prevents Us from Construing the Ambiguous Boundary Call to Include State Land Held in Fee Simple Absolute
 
 
 
 92
 Since "along the river" is ambiguous, we now turn to Minnesota, which involved litigation over the disposition of swamp lands granted by the federal government to Minnesota in 1860 that were then included by the federal government in land grants to the Chippewa Indians in various treaties in the 1860s. The Court declined to read the subsequent treaties with the Chippewa as divesting rights to land that already had been granted to the state in 1860, even if the areas reserved by the Chippewa treaties "were sufficient to carry the whole of each area" previously granted to the state, because the "purpose to do so [was not] shown in the treaty with such certainty as to put it beyond reasonable question." Minnesota, 270 U.S. at 209, 46 S.Ct. 298. Here, as with Minnesota, we find nothing in the treaty that expresses any intention to convey the Islands, and certainly nothing expressed "with such certainty as to put it beyond reasonable question." See Oneida II, 860 F.2d at 1163-64.
 
 
 93
 The Senecas contend that the rule in Minnesota can only apply where the claimed property rights are established by prior federal statute, presumably because Congress should not be assumed to have granted the same land twice. This contention overlooks the fact that the holding of Minnesota—based as it was on uncertainty over the scope of the federal treaty power—does not support this reading.[27] See Minnesota, 270 U.S. at 209, 46 S.Ct. 298. The Supreme Court has never directly determined whether a treaty could appropriate and cede state land to another sovereign, but it has expressed considerable skepticism about this power in dicta.[28] See, e.g., Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642 (1890) ("It would not be contended that [the treaty power] extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent."); Fort Leavenworth R.R. Co. v. Lowe, 114 U.S. 525, 540-41, 5 S.Ct. 995, 29 L.Ed. 264 (1885) ("The jurisdiction of the United States extends over all the territory within the States, and, therefore, their authority must be obtained, as well as that of the State within which the territory is situated, before any cession of sovereignty or political jurisdiction can be made to a foreign country."); see also Goodtitle v. Kibbe, 50 U.S. (9 How.) 471, 478, 13 L.Ed. 220 (1850) (holding in dicta that Congress would not have been able to grant or confirm a title to land when the sovereignty and dominion over it had become vested in the state). Accordingly, since the Treaty of Canandaigua expresses no intention to divest New York of its title to the Islands, Minnesota bars a construction that would include the Islands.
 
 VII. Conclusion
 
 94
 Since we find that the Islands were not within the boundaries of the "property of the Seneka nation" as of the 1794 Treaty of Canandaigua, and that therefore New York's title remained undisturbed by that treaty, we conclude that its "purchase" of the Islands did not violate the Non-Intercourse Act. For these reasons, the judgement of the District Court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The Senecas are joined by Plaintiff-Intervenor-Appellant the Tonawanda Band of Seneca Indians, which separated from the Seneca Nation in the mid-Nineteenth centurySee Seneca Nation of Indians v. New York, 206 F.Supp.2d 448, 453 n. 2 (W.D.N.Y.2002) (Seneca II). Both entities are recognized as successors-in-interest to the historic Seneca Nation. Id. at 454. We refer to the Senecas and Tonawandas collectively as the "Senecas."
 
 
 [2]
 Treaty between State of New York and Seneca Nation of Indians (Sept. 12, 1815) (the "1815 Transaction"), State Assembly Doc. 51, at 211-12 (N.Y.1889). The Senecas also allege that an easement they granted in 1954 to the State of New York through the Cattaraugus Reservation was void under the Non-Intercourse Act. Judge Arcara dismissed that claim on sovereign immunity grounds, and the Senecas appealed that ruling. We dispose of that claim in a separate opinion
 
 
 [3]
 The Non-Intercourse Act was first passed by Congress in 1790, and was subsequently amended several times. The 1802 version, which is at issue in this litigation, provided that
 no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian, or nation, or tribe of Indians, within the bounds of the United States, shall be of any validity, in law or equity, unless the same be made by treaty or convention, entered into pursuant to the constitution ...: Provided nevertheless, that it shall be lawful for the agent or agents of any state, who may be present at any treaty held with Indians under the authority of the United States, in the presence, and with the approbation of the commissioner or commissioners of the United states, appointed to hold the same, to propose to, and adjust with the Indians, the compensation to be made, for their claims to lands within such state, which shall be extinguished by the treaty.
 Non-Intercourse Act of 1802, § 12, 2 Stat. at 143 (1802). The Non-Intercourse Act was amended once more in 1834, and stands codified at 25 U.S.C. § 177.
 
 
 [4]
 Aboriginal title refers to the Indians' exclusive right to use and occupy lands they have inhabited "from time immemorial," but that have subsequently become "discovered" by European settlersCounty of Oneida v. Oneida Indian Nation of New York, 470 U.S. 226, 233-34, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (Oneida I); Johnson v. M'Intosh, 21 U.S. (8 Wheat) 543, 572-74, 5 L.Ed. 681 (1823). Under the doctrine of discovery, European nations that "discovered" lands in North America held fee title to those lands, subject to the inhabiting Indians' aboriginal right of occupancy and use. See Oneida I, 470 U.S. at 234. Aboriginal title, however, was not inviolable. Indians were secure in their possession of aboriginal land until their aboriginal title was "extinguished" by the sovereign discoverer. See Oneida Indian Nation v. New York, 860 F.2d 1145, 1150 (2d Cir.1988) (Oneida II). Extinguishment could occur through a taking by war or physical dispossession, or by contract or treaty, id. at 1159 (citing 3 The Writings of Thomas Jefferson 19 (Lipscomb et al. eds.1904)), and did not give rise to an obligation to pay just compensation under the Fifth Amendment, see Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 283-85, 75 S.Ct. 313, 99 L.Ed. 314 (1955). Typically, extinguishment resulted in the joining of the possessory and ownership rights to the land in fee simple in the sovereign, but where the fee title was devised by the sovereign prior to extinguishment of aboriginal title, the devisee held the "right of preemption," which was the exclusive, alienable right to acquire fee title to Indian land upon extinguishment. See Oneida II, 860 F.2d at 1150. The right of preemption, the District Court correctly noted, is similar to a contingent future interest in the land: only extinguishment by the sovereign could trump the Indian right of occupancy and thereby perfect the right of preemption. See Seneca II, 206 F.Supp.2d at 504.
 
 
 [5]
 This case was the subject of a prior interlocutory appealSee Seneca Nation of Indians v. New York, 26 F.Supp.2d 555 (W.D.N.Y.1998), aff'd, 178 F.3d 95, cert. denied sub nom. New York v. Seneca Nation of Indians, 528 U.S. 1073, 120 S.Ct. 785, 145 L.Ed.2d 662 (2000) (Seneca I).
 
 
 [6]
 The District Court's recitation of the relevant history is as thorough as that history is lengthySee Seneca II, 206 F.Supp.2d at 455-498. Accordingly, we recount only the salient events, presuming familiarity with Judge Arcara's opinion.
 
 
 [7]
 The tract consisted generally of land that was "formerly posest by seaven nations of Indians called the Aragaritka whom by a fair warr [the Iroquois] subdued and drove from thence four score years agoe ... and soe became to be the true owners of the same by conquest,"id., and over which the Iroquois had hence enjoyed "peaceable and quiet possession... to hunt beavers" until the then-recently terminated war with France, 1701 Deed, reprinted in 4 NY Colonial Documents at 908. Specifically, the Iroquois promised that "wee ... nor our heires nor any other person or persons for us by any ways or meanes hereafter have claime challenge and demand of in or to the premises or any parte thereof," provided, however, that they be given "free hunting for us and the heires and descendants from us the Five nations for ever and that free of all disturbances expecting to be protected therein by the Crown of England." Id. at 909-10.
 
 
 [8]
 As further evidence of this interpretation, the Senecas in 1765 offered Navy Island to Lieutenant Colonel John Vaughan of the British Army at Niagara. Vaughan asked Johnson what to do about the offer,see Letter from Lieut. Col. John Vaughan to Sir William Johnson (Aug. 4, 1765), reprinted in 11 Sir William Johnson Papers 878 (R.E. Day ed.1921) [hereinafter Johnson Papers], to which Johnson replied:
 I am glad the Senecas shew so much Affection to you as to offer you Navy Island.—At the general Conference I held with them last Summer at Niagra [sic] after making a Cession of the Carrying Place & c to his Majesty, they did publickly make me a Present of all the islands in the Streight from the Great Falls to Lake Erie, as a return for the great trouble they had repeatedly given me, in which Navy Island is included.—but as I thought very little of their Gift, nor ever possessed any Land, but what I formerly bought from the White Inhabitants, I Judged it might prove of more use to the Government, and accordingly made a Tender of the Whole to his Majesty in my letter to London at that time, since which I have heard no more about it.... I never intended any of these Places shou'd be my Property.... [P]erhaps the Government at home might make you a Grant of that Island in consequence of the Indians publicly acquiescing therein. This is the only Method of Obtaining Lands at present; but as those Islands are within the District secured by the Treaties in 1701 and 1726 to the Indians, and their Posterity, his Majesty may object to its becoming private Property....
 Letter from Sir William Johnson to Lieut. Col. John Vaughan (Aug. 15, 1765), reprinted in 11 Johnson Papers, supra, at 894, 895.
 
 
 [9]
 However, the United States retained "the sole and exclusive right and power of determining on peace and war,"id. art. IX, cl. 1, not subject to any limitation resembling the Legislative Rights Proviso. We have previously interpreted these provisions, in a similar context, as having granted to the Congress the exclusive power to make treaties of war and peace with the Indians, but to "give the states the power to purchase [or preempt] Indian land within their borders and extinguish Indian title to such land so long as such activity did not interfere with Congress's paramount powers over war and peace with the Indians." Oneida II, 860 F.2d at 1154. The concepts of extinguishment and preemption of Indian land are briefly discussed at supra note 4.
 
 
 [10]
 As noted earlier, it is unclear whether, in fact, the Legislative Rights Proviso granted New York the right to make apeace treaty with the Indians. See supra note 9. When the confederal treaty commissioners learned of New York's intent, they beseeched the state to "subordinate its business with the Indians to that of the [confederal] treaty, as Pennsylvania had done," Seneca II, 206 F.Supp.2d at 477, but New York pressed on, ultimately unsuccessfully.
 
 
 [11]
 The disagreement was rooted in the fact that Massachusetts's original royal grant of 1620 ran "from sea to sea" and extended past the former Dutch colony of New York into and beyond what is now the western part of New York state. Joint Stip. ¶ 79
 
 
 [12]
 New York's territory to the west of the boundary established by the Hartford Compact extended only to the meridian running through the westernmost point of Lake Ontario because of New York's prior cession in 1782 to the confederal government
 
 
 [13]
 To address this dissatisfaction, the United States attempted in the 1789 Treaty of Fort Harmer to reach an agreement with the Iroquois Nations providing for greater compensation for the territories ceded in 1784, but the treaty was never ratifiedSeneca II, 206 F.Supp.2d at 482; Joint Stip. ¶ 84. Nevertheless, it appears that the Senecas were compensated under the 1789 Treaty for their cessions in 1784. See Letter from George Washington, President of the United States, to Seneca Chiefs (Jan. 19, 1791), reprinted in 4 American State Papers 144 (1832) ("But, while you complain of the treaty of fort Stanwix, in 1784, you seem entirely to forget that you, yourselves, ... confirmed by the treaty of fort Harmer, ... the boundary marked at the treaty of fort Stanwix, and that, in consideration thereof, you then received goods to a considerable amount."). A series of letters between the Senecas and President Washington highlighted the Senecas' discontent with the 1784 boundary line. See 4 id. at 140-44. The Senecas acknowledged that their allegiance to the British during the Revolutionary War was in error, but pleaded with the United States to "[re]consider that treaty, and restore us part of that land," and asked to "pass along [the Niagara portage], and continue to take the fish of those waters in common with [the United States]." 4 id. at 143. Washington replied, however, that he could not "disannul treaties formed by the United States," and that "[t]he lines fixed at fort Stanwix and fort Harmer, must, therefore, remain established." 4 id. at 144.
 
 
 [14]
 The boundary was not finalized until 1822, when the Commission concluded its report. The final boundary ran along the navigable channel of the Niagara River, leaving most of the Islands within the United States. Joint Stip. ¶ 112
 
 
 [15]
 The term "recognized title" refers to title to Indian lands that has been recognized by federal treaty or statute. It is distinct from aboriginal title because it is the equivalent of fee simple ownership. Aboriginal title, on the other hand, can be extinguished without any obligation to pay just compensation under the Fifth AmendmentSee Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 278-83, 75 S.Ct. 313, 99 L.Ed. 314 (1955).
 
 
 [16]
 The United States urges us to leap past the issue of New York ownership of the Islands altogether, arguing that, even if it were established that New York held title to the Islands pursuant either to the 1764 Treaties or the 1784 Treaty of Fort Stanwix, the 1794 Treaty of Canandaigua lawfully divested the State of that title and confirmed it in the Senecas. However, the doctrine of constitutional avoidance counsels rejection of this argument. We express considerable skepticism about the ability of the federal government, by its constitutional treaty power, to cede state land to foreign nations absent the state's consentSee, e.g., United States v. Minnesota, 270 U.S. 181, 209, 46 S.Ct. 298, 70 L.Ed. 539 (1926) (refusing to hold that, but not reaching whether, the treaty-making power is so "far-reaching" to permit the federal government to divest a state of the latter's right in lands within its territory); Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642 (1890) ("It would not be contended that [the treaty power] extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent."); see also Reid v. Covert, 354 U.S. 1, 17-18 & n. 33, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (reaffirming the supremacy of the Constitution over a treaty, with reference to Geofroy and Minnesota); but see Missouri v. Holland, 252 U.S. 416, 434, 40 S.Ct. 382, 64 L.Ed. 641 (1920) (noting that a treaty may override the power of states over "the great body of private relations," and holding valid a treaty regulating the treatment of migratory birds that travel within the borders of states). Accordingly, we examine first whether New York had secured title to the Islands before the 1794 Treaty of Canandaigua. Because we conclude that New York did possess the land prior to 1794, in Part VI.B, infra, we reach the question of whether the Treaty of Canandaigua divested the state of title to the Islands.
 
 
 [17]
 Although these principles were articulated specifically with reference to treaties and other legislative enactments by the United States government, and rely in part on "the policy of the Federal Government ... to respect the Indian right of occupancy,"Santa Fe, 314 U.S. at 345, 62 S.Ct. 248, we see no reason not to apply a similar standard to Indian treaties negotiated by Great Britain, a prior sovereign.
 
 
 [18]
 The Senecas point to the contemporary writings of Sir William Johnson as lending support to their reliance on these words as evidence that there was no intent to extinguish Seneca title by these treaties. In his speech to the Senecas outlining the proposed articles of peace in April 1763, Johnson articulated five terms on which the Senecas would be required to agree, including: granting to the British "a free use of the [portage] of Niagara, with the Lands from the Fort to the Creek above little Niagara, the Breadth of 4 miles from the River, and free liberty to Cut Timber for Building, Fire Wood & c ... [and] a free open Road through your Country for the Passage of the English with Cattle, Carriages or otherwise with the free Occupancy of the Lakes, Rivers, Creeks, & c." 11Johnson Papers, supra, at 154-55. The Senecas note that no reference to any "cession" of Seneca territory is contained in these writings, and that the uses reserved to the British are perfectly consistent with Seneca title and "were typical in early Indian treaties and reflected the area's continuing status as Indian territory." Appellants' Br. at 17. Indeed, we agree that Johnson's proposals whereby the Senecas would allow the British "free use" of the portage and the land surrounding the river, and "free liberty" to take timber from its forests, do not conjure the imagery of a fee simple owner asserting absolute authority over his territory.
 
 
 [19]
 The 1701 Deed between the Iroquois and British provided that the Iroquois "surrender[], deliver[] up and for ever quit claim[]... unto ... the King of England ... for ever all the right title and interest and all the claime and demand whatsoever," provided that they "have free hunting," 1701 Deed,reprinted in 4 NY Colonial Documents, supra, at 909, while the 1726 Deed had the Iroquois "submitting and giving up all their land ..., including the subject lands," and described the 1701 Deed as having given up and rendered all their land to the Crown, with the land to be held by the Crown and protected by it for the Iroquois. Deed in Trust from Three of the Five Nations of Indians to the King, reprinted in 5 NY Colonial Documents, supra, at 800-01.
 
 
 [20]
 In addition, while the Iroquois Nations retained "the liberty of hunting throughout the Country as [we] have no other means of subsistance [sic] and as [the colonists] have not the same occasions or inclinations," the colonists would "be restricted form hunting on our side of the Lien to prevent contensions between us." 1768 Conditions,reprinted in 8 NY Colonial Documents, supra, at 127.
 
 
 [21]
 In his 1774 report on the Province of New York, Governor Tryon acknowledged the uncertainty of New York's westernmost boundaries, seeing as they depended on the "Extent the Five Nations carried their claim to the Westward and Northward,"Tryon Report, reprinted in 8 NY Colonial Documents, supra, at 434, 436, but concluded, "[w]ithout any view to the more Westerly claim of the Five Nations," that the "Boundaries of the Province of New York," on the west, extended "to a point in Lake Erie which bears due South from the East Bank of the Streight [sic] of D'Etroit and of Lake Huron to the Forty Fifth Degree of Northern Latitude." Id. at 436-37. This would encompass most of present-day southeastern Ontario, and nearly all of that territory located between Lakes Huron, Erie, and Ontario, including the Niagara region.
 
 
 [22]
 See An Act to facilitate the Completion of the Articles of Confederation and perpetual Union among the United States of America, N.Y. Legis. Papers, No. 596 (Feb. 19, 1780) [hereinafter New York Act of Cession], reprinted in Report of the Regents of the University on the Boundaries of the State of New York 149-54 (1874).
 
 
 [23]
 This Legislative Rights Proviso, we have held, secured to the states the power to purchase Indian land within their borders without congressional approval, subject, however, to the confederal government's authority to prohibit any such purchases that would imperil the peaceOneida II, 860 F.2d at 1160-61.
 
 
 [24]
 The 1784 Treaty of Fort Stanwix, unlike the Treaties of Dumplin Creek and Hopewell, did not give state land to Indians but purported to give it to the United States. See 1785 Treaty of Dumplin Creek, May 31, 1785, reprinted in Early American Indian Documents: Treaties and Laws, 1607-1789 (Colin G. Galloway ed., 1994); 1785 Treaty of Hopewell, Nov. 28, 1785, 7 Stat. 18. In light of the express prohibition in Article IX(2) against the taking of state land for the confederal government's benefit, we find this distinction significant
 
 
 [25]
 Compare Joseph K. Angell, Treatise on the Right of Property in Tide Waters and in the Soil and Shores Thereof 62 (Fred B. Rothman & Co.1983) (1826) ("The line of demarcation between the navigable river and the public highway, or in other words, between the public and private right to the soil, being established by the tide at high-water."), with John Egremont, 1 The Law Relating to Highways, Turnpike-Roads, Public Bridges and Navigable Rivers 199, 197, 201 (1830) (declaring that "[t]he flowing of the tide ... is strong prima facie evidence of ... a public navigable river," but referring elsewhere to navigability as determined by whether a river is "usable"), and Humphry W. Woolrych, A Treatise on the Law of Waters and of Sewers 33 (1830) ("Public use[] for the purposes of commerce is, consequently, the most convincing evidence of the existence of a navigable river, and that fact being established, the accompanying rights ... of ownership of soil ... [is] easily defined.").
 
 
 [26]
 Indeed, the common law rule was inconsistent from state to state in the fledgling republic. The New York Court of Appeals, for instance, held inPeople ex rel. Loomis v. Canal Appraisers, 33 N.Y. 461, 467 (1865), that "[u]pon the separation of the colonies from the crown of Great Britain, the people of this State succeeded to all the rights of the British crown to lands within its territorial jurisdiction, and prima facie being the owners of the lands covered by the waters of the Mohawk river"—a freshwater navigable river, unaffected by tides—"they can use those waters for any purpose." In fact, the Court traced, from as early as 1786 and at the latest 1792, evidence that the New York legislature considered the state to be the owner of freshwater riverbeds of navigable rivers. Id. at 464-66. Thus, we disagree with the Senecas' contention that the theory that the sovereign owned title to the beds of all rivers navigable in fact, tidal or not, was first espoused in Chief Justice Kent's dissent in Palmer v. Mulligan, 3 Cai. R. 307, 318 (N.Y.1805) (Kent, J., dissenting). In fact, the Court of Appeals in Loomis criticized a line of New York cases emanating from the Palmer dissent as ignoring the 1786 and 1792 acts of the legislature that "repudiated the doctrine enunciated, and ... claimed title in the people of this State to the lands under water of all the navigable rivers of the State." Loomis, 33 N.Y. at 475.
 
 
 [27]
 In addition, the rule urged by the Senecas would place the property rights of states, such as Minnesota, created by Congress after 1789 on firmer footing than those of the original thirteen, whose property rights were inherited from the Crown. This result is not permitted by the Equal Footing DoctrineSee Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 203, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) ("[A]ll States are admitted to the Union with the same attributes of sovereignty (i.e., on equal footing) as the original 13 States.").
 
 
 [28]
 The Senecas citeLessee of Lattimer v. Poteet, 39 U.S. (14 Pet.) 4, 10 L.Ed. 328 (1840), as support for the proposition that the treaty power permits the federal government to appropriate state land and cede it to Indians. We disagree. In Lattimer, the Court did not read the treaty power to permit the appropriation of state land by the federal government, but rather interpreted a treaty boundary to be retroactive so as to avoid having to address this question. Id. at 13-14.